# UNION PACIFIC RAILROAD COMPANY *v.* UP-DIKE GRAIN COMPANY AND CROWELL LUM-BER AND GRAIN COMPANY.

### ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 353, 354, 355, 356.   Argued October 18, 1911.—Decided December 4, 1911.

*Interstate Commerce Commission* v. *Diffenbaugh, ante,* p. 42, followed to effect that under the Interstate Commerce Law, as amended by the act of June 29, 1906, c. 3591, 34 Stat. 584, 590, elevation of grain is included in transportation, and, subject to the power of the Commission to determine the reasonableness of the payments, carriers can compensate owners of grain in transit for elevation services rendered in connection therewith.

Although a carrier may have had an ulterior motive in establishing a general rate of compensation for services rendered to it in connection with goods in transit, the real consideration is the service rendered; and even if the carrier does not realize the desired benefit it cannot deprive one actually rendering the service of the compensation on the ground of non-compliance with regulations of an association of which the carrier is a member and over which the party rendering the service has no control.

A carrier must treat all alike. It cannot pay one shipper for services rendered to his goods in transit, and, by enforcing an arbitrary rule, deprive another shipper rendering similar services of compensation therefor.

A rule apparently fair on its face and reasonable in its terms may, in fact, be unfair and unreasonable if it operates so as to give one an advantage of which another similarly situated cannot avail.

In this case *held,* that the Union Pacific Railroad Company could not refuse to pay the owner of an elevator located on other railroads compensation for elevating grain similar to that paid to owners of elevators located on its own railroad on account of failure to return cars within an arbitrary and unreasonable time fixed by the Union Pacific; but also *held* that such cars should be returned within a reasonable time in order to entitle the parties rendering service to compensation therefor.

178 Fed. Rep. 223, affirmed.

THE facts are stated in the opinion.

*Mr. Maxwell Evarts*, with whom *Mr. F. C. Dillard* and *Mr. Henry W. Clark* were on the brief, for plaintiff in error.

*Mr. Edward P. Smith*, with whom *Mr. Constantine J. Smyth* was on the brief, for defendants in error.

*Mr. Constantine J. Smyth* and *Mr. Edward P. Smith*, with whom were *Mr. Nelson H. Loomis*, *Edson Rich*, *F. C. Dillard*, *R. W. Blair* and *E. H. Crocker*, filed a brief for plaintiff in error on motion to dismiss.

MR. JUSTICE LAMAR delivered the opinion of the court.

In 1899, the Union Pacific found it desirable to have grain unloaded at its terminals in Council Bluffs in order that cars might be promptly returned for use on its line. In consideration that Peavey would there erect and maintain an elevator, it agreed to pay him 1½ cents per hundred for elevating grain. It subsequently made similar contracts with what are called "Peavey Companies" which had elevators along its tracks in the cities of Omaha, South Omaha and Kansas City, terminal points of the Union Pacific. Thereafter it agreed, on certain conditions, to pay for similar service by elevator companies in the same cities, even though the elevators were not located immediately on the railroad tracks. It thereupon filed a Tariff Circular with the Commission, in which the Union Pacific recited that "to expedite the movement, and to secure the prompt release and return of equipment, an allowance . . . will be made" to elevators performing the service on through grain in carloads, transferred by the elevators at the points named:

"No allowance will be made when more than forty-eight hours elapse between time of delivery . . . to the elevator, or connecting lines and the release and return of the empty cars to the Union Pacific."

That company was and is a member of a railway association, which regulated the switching, loading and unloading of cars. One of its rules provided that:

"Cars received loaded in switching service must be confined to switching territory and when made empty must be returned to the owner if a direct connection within that territory or otherwise to the road from which received or may be loaded in accordance with Rule 2 a, b or c.

Rule 2 (a). "Loaded via any route so that the home road will participate in the freight rate; (b) loaded to the road from which originally received, if such loading is in the direction of the home road, but not otherwise; (c) loaded to an intermediate road in the direction of the home road."

As the Peavey elevators were located alongside the tracks of the Union Pacific, these rules did not affect their right to recover for elevation service. But, as the elevators of the defendants in error were located on the lines of other railroads in Omaha and South Omaha, it frequently happened that cars, after being unloaded at their elevators, were not returned to the Union Pacific, and that others were not returned within 48 hours. In those cases the Union Pacific refused to make payment for unloading these cars. The defendants in error filed a complaint with the Commission, asking for reparation. An order to that effect having been granted, they brought a joint suit for reparation.

Most of the allegations in the complaint were denied by the Union Pacific in its answer, which claimed that nothing was due, because the plaintiffs had not returned the cars within 48 hours stipulated in the tariff on file. It also alleged that the grain had been unloaded through plaintiffs' private elevators, which were not operated in the exercise of any public duty, but for the purpose of private gain; that the handling of the grain was for the

purpose of having it weighed, stored, inspected, cleaned, mixed or otherwise treated in the elevator, and that the tariff allowing for elevator charges in their elevator was unlawful.

After hearing evidence showing the amount of grain elevated for which payment had not been made, and considering the tariff and rules of the switching company, the court directed a verdict in favor of each of the plaintiffs for the amount shown to be due them. The judgment as modified was affirmed by the Circuit Court of Appeals, 178 Fed. Rep. 223, and the railroad brought the case here. There are forty assignments of error, but they need not be separately considered, as the case must be determined by a few controlling principles:

1. The Union Pacific's contention that payment for reparation cannot be made to the owner who stores and mixes the grain must first be considered.

The long mooted question as to whether elevation was such a part of transportation as to bring it within the jurisdiction of the Interstate Commerce Commission was answered by the act of June 29, 1906, 34 Stat. L. 584, 590, c. 3591, in which Congress declared that "the term 'transportation' shall include . . . all . . . . facilities of shipment, . . . irrespective of ownership, . . . and all services in connection with the . . . elevation, and transfer in transit . . . and handling of property transported." Carriers were required "to provide and furnish such transportation upon reasonable request therefor."

The act recognized that the shipper himself might own the elevator or other facility included within the definition of transportation. For § 4 (34 Stat. 590) provides that "if the owner . . . renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable,"

the Commission being authorized to determine what was reasonable.

This act was passed after the decision by the Commission in 1904 (10 I. C. C. 309), that the Peavey contract was valid, and after the recommendation in its report for 1905 (p. 11), that it should be given authority to determine whether the allowance paid to the owner was just. The statute must be taken as a legislative recognition of the long-continued practice and a declaration that the incidental advantage derived by the owner was not undue.

In pursuance of the authority thus expressly conferred the Interstate Commerce Commission, in April, 1907 (12 I. C. C. 86), fixed the allowance for elevating grain at ¾ of a cent per hundred pounds, being actual cost, with no allowance whatever for profit. Its final order (14 I. C. C. 315), prohibiting any payment to the owner who performed this transportation service was reversed, as being beyond the jurisdiction of the Commission, because Congress had expressly permitted such payment to be made (*Interstate Commerce Commission* v. *Diffenbaugh, Same* v. *Peavey, ante*, p. 42). The language of the statute and this decision answer the Union Pacific's contention that it was unlawful to pay these companies for transportation services.

2. The Union Pacific's desire to have cars promptly unloaded so that they might be returned to its own line may have been the principal motive which induced it to agree to pay elevator charges. But the consideration, moving between the carrier and the elevator, was the service performed by the latter in unloading grain at terminal points. This relieved the carrier of the expense of building similar structures and avoided the delay of having the grain transferred from one car to another by the slow process of shovelling. When the service was rendered, the carrier received value for which it was bound to pay, whether performed by the owner of the grain or

some other person hired for the same purpose. Having earned the compensation, the elevator company could not be deprived of its right because foreign cars were not returned to the Union Pacific under the rules of the railway association, of which the Union Pacific was a member and over which the elevator companies had no control.

3. For elevating grain from like foreign cars the Peavey Companies were paid because their elevators happened to be located on the Union Pacific tracks. But if the rule is valid against the plaintiffs, it would put it in the power of the carrier to say which elevator should be paid, and which not paid, for performing the same transportation service. It could load grain belonging to the plaintiffs into foreign cars, and in spite of the service rendered by them to the carrier in unloading, no payment would be made, because these foreign cars, under the rule, were not returned to the Union Pacific. It is not necessary that any such improper purpose should be shown to exist. It might have existed, and if so, could not be proved by the injured party. The power to make such a discrimination would prevent the enforcement of any regulation frequently having such operation.

The carrier cannot pay one shipper for transportation service and enforce an arbitrary rule which deprives another of compensation for similar service. To receive the benefit of such work by one elevator without making compensation therefor would, in effect, be the involuntary payment by such elevator of a rebate to the railroad company, for it would enable the railroad to receive more net freight on its grain than was received from its competitor located on the railroad's tracks. This cannot be directly done, nor indirectly by means of regulation. A rule apparently fair on its face and reasonable in its terms may, in fact, be unfair and unreasonable if it operates so as to give one an advantage of which another similarly situated cannot avail himself.

4. The trial court was right in holding that the railroad company must make reparation by paying for the elevation of grain in those cars not returned in forty-eight hours, because they belonged to the switching company, or to a road which had a direct connection in the switching territory (2 a), and in those which when emptied were routed so that the home road participated in the freight rate (2 b).

But while elevators off the tracks of the Union Pacific cannot be affected by unreasonable rules tending to deprive them of just compensation, neither can they disregard the obligation promptly to unload, so that the cars might be put in service as soon as practicable. This was conceded by the defendants in error, and they accepted the ruling that they were not entitled to recover for elevating grain out of some 200 cars, which could have been unloaded and returned in a much shorter time, but which they detained beyond the forty-eight hours.

*Judgments affirmed.*

Mr. Justice McKenna and Mr. Justice Hughes concur in the result in view of the decision in *Interstate Commerce Commission* v. *Diffenbaugh, Same* v. *Peavey, ante,* p. 42.