## OLIVER BROS., Inc., et al. v. FEDERAL TRADE COMMISSION.

### No. 4349.

Circuit Court of Appeals, Fourth Circuit.

March 25, 1939.

T. Russell Cather, of Winchester, Va., and Felix H. Levy, of New York City (John D. Swartz, of New York City, on the brief), for petitioners.

Allen C. Phelps, Sp. Atty., Federal Trade Commission, of Washington, D. C. (W. T. Kelley, Chief Counsel, Federal Trade Commission, of Washington, D. C., on the brief), for respondent.

Raymond N. Beebe, Adrien F. Busick, Seth W. Richardson, and Davies, Richberg, Beebe, Busick & Richardson, all of Washington, D. C., amici curiæ.

Before PARKER and SOPER, Circuit Judges, and WYCHE, District Judge.

PARKER, Circuit Judge.

This is a petition to review an order of the Federal Trade Commission directing petitioners to cease and desist from payment or receipt of fees or commissions in violation of section 2(c) of the Robinson-Patman Act, 49 Stat. 1526, 15 U.S.C.A. § 13(c). The order was entered in a proceeding instituted against Oliver Brothers, Inc., hereafter referred to as Oliver, a purchasing agent for wholesale distributors, certain of the buyers whom it represented in making purchases and certain of the manufacturers or sellers from whom purchases were made. The charge was that, while acting as agent for the buyers, Oliver received brokerage commissions from the sellers which it credited or passed on to the buyers. The case was heard on a stipulation that the record made in the proceeding of the Commission against the Biddle Purchasing Company et al. should be adopted as the record correctly describing the business practices of Oliver; and the order in the Oliver case followed, in substance, the findings and order in the Biddle case. The Biddle order was reviewed by the Circuit Court of Appeals of the Second Circuit and petition to set it aside was denied in Biddle Purchasing Co. v. Federal Trade Commis-

sion, 2 Cir., 96 F.2d 687, 689, and certiorari was denied by the Supreme Court. 59 S. Ct. 101, 83 L.Ed. ——. To the petition that we review and set aside the order in the Oliver case, the Commission has filed a cross petition asking a decree for the enforcement of the order.

There is, in reality, no dispute as to the facts, but only as to the inferences to be drawn from admitted facts and constituting mixed questions of law and fact. All of the petitioners are engaged in interstate commerce. Oliver furnishes a purchasing service to over 300 distributing concerns scattered over the United States, who are principally wholesalers of automobile, electrical, radio, mill, machine, plumbing, steam and hardware supplies. It has an office in New York and a branch office in Chicago. It has several salesmen who travel throughout the United States to solicit distributing concerns to purchase its market information and purchasing services and who, at times, contact manufacturers and processors. It has also a number of buyers and assistant buyers who place orders for its subscribers and deal with manufacturers, processors and producers in their behalf. It examines and tests the wares of such manufacturers and producers and obtains from them prices and descriptions of goods which it sends to its subscribers. It furnishes the subscribers a loose leaf price book, showing the prices and sources of supply of the merchandise in which they are interested, and keeps this book current by the issuance of price sheets and bulletins from time to time, as prices and sources of supply change. It also makes purchases for its subscribers of the goods described in its information service and gives them the benefit of the brokerage commissions which it collects from the sellers upon such purchasers. The Commission found that these brokerage commissions were passed on to the buyers with the knowledge of the sellers. Petitioners challenge this finding in so far as it relates to knowledge of the sellers; but an examination of the record shows that it is amply sustained by the testimony and that the matter was one of common knowledge in the trade. (See Biddle transcript of record pages 165, 193, 283, 284, 314, 321, 327, 347, 372, 379, 380, 387, 490, 544, 582, 596, 608, 615, 635, 645, 656, 675, 688, 741.)

For the informational and purchasing services thus rendered its subscribers,

Oliver receives a stipulated monthly compensation of $25 and upward. The brokerage commissions received by 86% of the subscribers on their purchases amount to less than the amount paid Oliver. Those received by the remaining 14% are in excess of the amount so paid.

A written contract is entered into between Oliver and each of its subscribers. This contract is on stationery describing Oliver as "Resident buyers for wholesalers of hardware, iron, steel, metals etc." The following provisions thereof are pertinent and illuminating:

"We hereby agree to act as your New York, Chicago and Pittsburgh Resident Representatives in the capacity of Purchasing Agents.

"We agree to furnish you our loose leaf Price Book and send you our General Service covering lines as per the subject hereof; also to send you Oliver Brothers' Comment Letters, letters on Market Conditions, lists of special offerings, and submit to you other information in the way of prices and market information which we may consider to be of interest to you.

"We will use our best efforts to secure the lowest possible prices on your inquiries or orders, we will forward to the manufacturers or parties with whom we have favorable arrangement such orders for merchandise as you may send to us.

"Orders which we may receive from you or letters which we may receive are to be regarded as authority to act as your Agents in connection with any transaction which may transpire between us. While we will use our best efforts in acting as your Agent it is understood that we will not be liable for the failure of any manufacturer of supplies to perform his agreements or promises in connection with quotations or shipments.

"It is mutually agreed that all communications between us in the way of correspondence, Comment Letters, letters on Market Conditions or Confidential Price Sheets, shall be treated as strictly confidential and used solely in connection with your own business and shall not be divulged to other parties nor procured for the use of other parties."

The facts with respect to the purchases made by Oliver are thus stated by the Commission:

"Oliver receives daily from its subscribers approximately one hundred orders. When a subscriber forwards an order to Oliver, usually at a specified price, Oliver transmits the order to the seller. The seller ships the product direct to the buyer, in most cases billing the buyer at the price specified in the order. The buyer in most cases makes payment direct to the seller. The seller then sends a commission or brokerage on the transaction and Oliver pays this to the buyer or credits it to his account. If a buyer fails to name the purchase price, he expects to get the last price quoted by Oliver in its bulletins, or a lower price. If Oliver finds that the market has advanced he communicates with the buyer and confirms the order at the new price before transmitting it to the seller. The buyer in some cases names the seller whose products are wanted, but in some cases he relies upon Oliver to transmit the order to some producer who will supply goods of the quality and standard required."

And the whole course of business between Oliver and its subscribers is summed up in paragraph 11 of the Commission's findings as follows:

"The contract between respondent Oliver Brothers, Inc., and its subscribers is construed by the parties thereto as being a contract for the sale and purchase of the Oliver market information service with a privilege extended to the buyers of using the Oliver purchasing services at their option. The buyers pay the monthly fee stipulated in the contract for the market information service. The buyers exercise their option to use the purchasing services of Oliver Brothers, Inc., in order to secure a discount in price from the current market price and the buyers when purchasing commodities through Oliver compute the net price at which the purchase is made as being the quoted price less the fee or commission paid by the seller as brokerage to Oliver and by Oliver transmitted to them. The buyers, in their bookkeeping, do not treat the brokerage fees and commission received from respondent Oliver Brothers, Inc., as being an offset to the monthly fee paid by them to Oliver. The amount of the monthly fee paid by the buyers to Oliver is fixed at the time the contract is made, but the amount of the brokerage fees and commissions which may be received by a given buyer from the utilization of the Oliver purchasing service is unknown and incapable of ascertainment at the time the contract is entered into."

In its tenth finding the Commission states its conclusions with respect to the agency of Oliver and the services rendered by it as follows:

"In all of the purchasing transactions which the respondent Oliver Brothers, Inc., executes for its buyers, Oliver Brothers, Inc., is the agent and representative of the buyer, and acts in fact for such buyer and in his behalf, and is subject to his control, insofar as such purchasing transaction is concerned. Said respondent Oliver Brothers, Inc., in such purchasing transaction is neither the agent nor representative of the seller nor does it act for or in behalf or is it under the control of such seller. Such services as respondent Oliver Brothers, Inc., may render to the seller in selling his commodities are incidental to the particular purchase and sale transaction, and if any services are so rendered by Oliver in connection with the sale or purchase of such commodities, such services are donated by Oliver Brothers, Inc., to the seller. There is not, in fact, any payment of brokerage commissions made by any of respondent sellers to respondent Oliver Brothers, Inc., which is not intended for the buyer and which does not reach the buyer. Such brokerage commissions, being intended for the buyers, are not in fact paid in satisfaction of any contractual or other indebtedness due from the seller to respondent Oliver Brothers, Inc., for services rendered, or otherwise. These payments, in effect are actually made from the seller to the buyer and the buyer receives a discount in price equivalent to the brokerage fee paid to him. Respondent buyers render no service to respondent sellers in connection with the purchase of commodities through respondent Oliver Brothers, Inc. Respondent buyers render no service to respondent Oliver Brothers, Inc., in connection with the purchase of goods, wares and merchandise made for them by said respondent Oliver Brothers, Inc."

. Complaint is made of this finding that it ignores evidence of certain sellers as to the benefit derived by them from dealings with Oliver. Briefly stated, this evidence is to the effect that these sellers furnish Oliver lists and prices of what they have to sell; that, in sending out circulars to its subscribers, Oliver brings about a sale of the goods more satisfactorily than a broker would do; and that for this reason brokerage commissions are allowed Oliver on sales resulting from the Oliver service. On the basis of this evidence, petitioners contend that the Commission should have found that Oliver renders a service to the sellers which justifies the commissions paid, and that the contrary finding by the Commission in its tenth finding of fact is unsupported by the evidence. As heretofore indicated, we think that the controversy here is over conclusions to be deduced from the facts rather than over the facts themselves; but as we shall hereafter point out we are in accord with the conclusions of the Commission.

On the whole record, there can be no doubt that the following is the truth with respect to the matters in controversy: Oliver is the agent of the buyers and not of the sellers and is paid by the buyers for the service rendered them. It collects brokerage commissions from the sellers on purchases made for the buyers which it credits to the accounts of the buyers or otherwise passes on to them. In furnishing the service which it has contracted to furnish the buyers, it affords to the sellers facilities for placing their goods before the buyers and obviates the necessity of their employing brokers to reach these customers; but this is a service rendered the buyers which Oliver has bound itself to render them under their subscription contracts. The benefit to the sellers is incidental to this service rendered the buyers and is not the result of a service undertaken for the benefit of the sellers.

No showing was made as to whether the effect of this practice of Oliver "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit" of the brokerage commissions allowed, as required by section 2(a) of the Robinson-Patman Act, 15 U.S.C.A. § 13(a), since the proceeding before the Commission was not had under that section but under section 2(c). The argument is made that the provisions of section 2(a) with respect to limitation of competition or tendency to create monopoly must be read into section 2(c), and that, unless this is done, section 2(c) is unconstitutional because violative of the due process clause of the Fifth Amendment, U.S.C.A.Const. These contentions of the petitioners, together with their contentions as to the applicability of the Act to the trade practices which we have out-

lined, present three questions for our consideration: (1) Must the Robinson-Patman Act be so construed as to read the limitations of section 2(a) into section 2(c) as limitations upon the latter section? (2) If not, is section 2(c) invalid when tested by the due process clause of the Fifth Amendment? And (3) does the case as presented fall within the exception contained in section 2(c)? We think that all of these questions must be answered in the negative.

The Robinson-Patman Act of June 19, 1936, 49 Stat. 1526, was an amendment of the Clayton Anti-Trust Act of October 15, 1914, 38 Stat. 730. Section 2 of the Clayton Act, which was the section amended, merely forbade discrimination in price when the effect of such discrimination was to substantially lessen competition or tend to create monopoly. The Robinson-Patman Act broadened the scope of this provision, conferred upon the Federal Trade Commission power to establish quantity differentials for the purpose of determining discrimination, and cast the burden of proof upon one charged with discrimination to justify any discrimination shown. Receipt of price discrimination was made unlawful for the first time, section 2(f), 15 U.S.C. A. § 13(f); and three specific matters were forbidden as unfair trade practices by subsections (c), (d) and (e), viz.: the granting of commission or brokerage, or any allowance in lieu thereof, to the other party to the transaction or his agent, the making of discriminatory payments by seller to buyer for services rendered by the latter and discrimination by the seller in the rendering of services to the buyer. It is perfectly clear that all three of these practices were forbidden because of their tendency to lessen competition and create monopoly, without regard to their effect in a particular case; and there is no reason to read into the sections forbidding them the limitations contained in section 2(a) having relation to price discrimination, which is an extremely difficult matter to deal with and is condemned as unfair only in those cases where it has an effect in suppressing competition or in tending to create monopoly. The forbidding of specific practices because of their tendency toward a general result, also forbidden, is familiar legislative practice; and no reason suggests itself why the limitations and provisions relating to one should be read into those relating to the other. The sub-section immediately applicable is section 2(c), which is as follows:

"(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

The language of this section is so clear that there is no occasion to resort to the reports of Congress to ascertain what was intended. It may not be amiss to note, however, that House Rep. 2687, 74th Cong., 2d Sess., has this to say with regard to it (it was then section (b):

"Section (b) deals with the abuse of the brokerage function for purposes of oppressive discrimination. The true broker serves either as representative of the seller to find him market outlets, or as representative of the buyer to find him sources of supply. In either case he discharges functions which must otherwise be performed by the parties themselves through their own selling or buying departments, with their respective attendant costs. Which method is chosen depends presumptively upon which is found more economical in the particular case; but whichever method is chosen, its cost is the necessary and natural cost of a business function which cannot be escaped. It is for this reason that, when free of the coercive influence of mass buying power, discounts in lieu of brokerage are not usually accorded to buyers who deal with the seller direct, since such sales must bear instead their appropriate share of the seller's own selling cost.

"Among the prevalent modes of discrimination at which this bill is directed is the practice of certain large buyers to demand the allowance of brokerage direct to them upon their purchases or its payment to an employee, agent, or corporate subsidiary whom they set up in the guise of a broker, and through whom they demand that sales to them be made. But the posi-

768

tions of buyer and seller are by nature adverse, and it is a contradiction in terms incompatible with his natural function for an intermediary to claim to be rendering services for the seller when he is acting in fact for or under the control of the buyer, and no seller can be expected to pay such an intermediary so controlled for such services unless compelled to do so by coercive influences in compromise of his natural interest. Whether employed by the buyer in good faith to find a source of supply, or by the seller to find a market, the broker so employed discharges a sound economic function and is entitled to appropriate compensation by the one in whose interest he so serves. But to permit its payment or allowance where no such service is rendered, where in fact, if a 'broker', so labeled, enters the picture at all it is one whom the buyer points out to the seller rather than one who brings the buyer to the seller, would render the section a nullity. The relation of the broker to his client is a fiduciary one. To collect from a client for service rendered in the interest of a party adverse to him, is a violation of that relationship; and to protect those who deal in the streams of commerce against breaches of faith in its relations of trust, is to foster confidence in its processes and promote its wholesomeness and volume."

And the Report of the House and Senate Conference Committee, House Rep. 2951, 74th Cong., 2d Sess., interprets the section as follows:

"This subsection permits the payment of compensation by a seller to his broker or agent for services actually rendered in his behalf; likewise by a buyer to his broker or agent for services in connection with the purchase of goods actually rendered in his behalf; but it prohibits the direct or indirect payment of brokerage except for such services rendered. It prohibits its allowance by the buyer direct to the seller, or by the seller direct to the buyer; and it prohibits its payment by either to an agent or intermediary acting in fact for or in behalf, or subject to the direct or indirect control, of the other."

■ And we are not impressed with the argument that when construed without the limitation prescribed by section 2(a) section 2(c) is violative of the due process clause of the Fifth Amendment. It is addressed to a definite evil in interstate trade and commerce which Congress has full power to regulate. It is uniform in operation and applies to all persons alike. It is not arbitrary or unreasonable, but is directed toward the elimination of hidden discriminations in price which are thought to be injurious to the proper operation of a free competitive system of trade and commerce and to have a tendency to promote unreasonable restraints and monopolization. As said by the Circuit Court of Appeals of the Second Circuit in the Biddle case, supra [96 F.2d 692]: "Congress may have had in mind that one of the principal evils inherent in the payment of brokerage fees by the seller to the buyer directly or through an intermediary, is the fact that this practice makes it possible for the seller to discriminate in price without seeming to do so. If a price discount is given as a brokerage payment to a controlled intermediary, it may be and often is concealed from other customers of the seller. One of the main objectives of section 2(c) was to force price discriminations out into the open where they would be subject to the scrutiny of those interested, particularly competing buyers."

Counsel for appellants rely upon Fairmont Creamery Co. v. Minnesota, 274 U. S. 1, 47 S.Ct. 506, 508, 71 L.Ed. 893, 52 A.L.R. 163, which held invalid, under the due process clause of the Fourteenth Amendment, U.S.C.A.Const., a state statute which forbade the purchase of milk in one locality of the state at a higher price than paid in another locality. That statute was held unconstitutional because it was thought that its inhibition had "no reasonable relation to the anticipated evil—high bidding by some with purpose to monopolize or destroy competition". The same cannot be said of the practice forbidden by the section here under consideration, as shown in the reports of the Committees of Congress from which we have quoted, supra. Of such a practice, what was said by the Supreme Court in Booth v. Illinois, 184 U.S. 425, 22 S.Ct. 425, 427, 46 L.Ed. 623, with respect to the prohibition of option contracts to sell or buy grain at a future time is appropos. The court said:

"The argument then is, that the statute directly forbids the citizen from pursuing a calling which, in itself, involves no element of immorality, and therefore by such prohibition it invades his liberty as guaranteed by the supreme law of the land. Does this conclusion follow from the premise stated? Is it true that the legislature is without power to forbid or suppress

a particular kind of business, where such business, properly and honestly conducted, may not, in itself, be immoral? We think not. A calling may not in itself be immoral, and yet the tendency of what is generally or ordinarily or often done in pursuing that calling may be towards that which is admittedly immoral or pernicious. If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the state thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law."

■ Any contention that this section of the statute constitutes an interference with freedom of contract is answered by what was said by the Supreme Court in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 581, 81 L.Ed. 703, 108 A.L.R. 1330, as follows:

"The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

"This essential limitation of liberty in general governs freedom of contract in particular. More than twenty-five years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described.

" 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' Chicago, B. & Q. R. Co. v. McGuire, 219 U.S. 549, 565, 31 S.Ct. 259, 262, 55 L.Ed. 328."

■ There is no ground for the contention that, in prohibiting practices because of their harmful tendency, Congress must limit its prohibition to cases in which those practices have actually resulted in the evil which it was the purpose of the statute to prevent. "If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio". Nebbia v. New York, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469.

■ We come then to the final question in the case, viz., whether the brokerage commissions here involved come within the exception contained in section 2(c), i. e., are they paid for services rendered to the sellers? A sufficient answer to the question is found in the fact that the commissions are received by the buyers and not by Oliver, and that there can be no contention that any services are rendered by the buyers to justify the payment of compensation to them. The fact that the commissions pass through the hands of Oliver is immaterial; for it is understood on all sides that they are paid for the benefit of and go to the buyers under the contract which Oliver has with them. The statute forbids the receiving of such commissions except for services rendered. The buyers receive them and they admittedly render no service to earn them. It is idle to contend that they are merely being reimbursed for what they have paid to Oliver by way of subscription. They are receiving brokerage commissions on their purchases; and the fact that they may have paid the purchasing agent for services rendered them and that they receive the commissions because of this does not alter the fact that they are receiving the commissions on their purchases.

And even if it were true that Oliver rendered services to the sellers, we do not think that this would change the situation. No one would contend that, without violating. this section, a broker representing the seller could give his commissions to the buyer; for in such case the action of the broker would be the action of his principal, the seller, and would amount to the allowance of commissions by the seller to the other party to the transaction in direct violation of the statutory provision. As we have seen, it constitutes a clear violation of the section for the buyer to receive commissions allowed an agent who represents him alone. If, therefore, the buyer may not receive commissions allowed either his own agent or the agent of the seller, it would seem to follow necessarily that he may not receive commissions allowed a broker who is the agent of both. We may assume that under the section it is permissible for a broker to render services to both buyer and seller and to receive from both compensation for the services rendered; but this is a very different thing from the buyer himself receiving the compensation.

And we think that the Commission was correct in holding upon the facts that the services rendered by Oliver were rendered to the buyers and not to the sellers. Oliver is the agent of the buyers, not of the sellers. The services rendered in advising the buyers as to the character and prices of sellers' merchandise are services rendered the buyers under their contracts, and are services rendered in the purchase and not in the sale of the goods. While such services resulting in sales by the sellers and obviating, no doubt, the adoption of other sales devices, are of undoubted benefit to them, this benefit is incidental and is an entirely different thing from the rendering of services by an agent responsible to the seller as principal. If it were a sufficient basis to bring the allowance of brokerage commissions within the exception of the section, every purchasing agent for a chain of stores might lawfully receive such commissions; for he does for the stores of his chain precisely what is done by Oliver for the subscribers to its service and benefits the sellers in making sales in precisely the same way. We have no doubt that it was just this sort of thing that it was the purpose of the act to prevent.

The case presented is not unlike that before the Supreme Court in Lehigh Valley R. Co. v. United States, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839, in which a carrier made payments to a shipper, who was a mere importer and forwarder, for services rendered in bringing business to its road. In holding this a violation of the provisions of the Elkins Act § 1, as amended, 49 U.S.C.A. § 41, the Supreme Court, speaking through Mr. Justice Holmes, said:

"It is true, no doubt, that George W. Sheldon & Company in the performance of the services for which it is paid, maintains offices here and abroad, advertises the railroad, solicits traffic for it, does various other useful things, and, in short, we assume, benefits the road and earns its money, if it were allowable to earn money in that way. It is true also that in Interstate Commerce Commission v. F. H. Peavey & Co., 222 U.S. 42, 32 S.Ct. 22, 56 L.Ed. 83, an owner of property transported was held entitled under section 15 of the Act to Regulate Commerce [49 U.S.C.A. § 15], to an allowance for furnishing a part of the transportation that the carrier was bound to furnish. So Union Pacific R. R. Co. v. Updike Grain Co., 222 U.S. 215, 32 S.Ct. 39, 56 L.Ed. 171, and United States v. Baltimore & Ohio R. R. Co., 231 U.S. 274, 34 S.Ct. 75, 58 L.Ed. 218. But that case goes to the verge of what is permitted by the act. The services rendered by George W. Sheldon & Company, although in a practical sense 'connected with such transportation,' were not connected with it as a necessary part of the carriage,—were not 'transportation service,' in the language of Union Pacific R. R. Co. v. Updike Grain Co., 222 U.S. 215, 220, 32 S.Ct. 39, 56 L.Ed. 171, 173,—and, in our opinion, were not such services as were contemplated in the Act of June 29, 1906, chap. 3591, § 4, 34 Stat. at L. 589 [49 U.S.C.A. § 15], amending § 15 of the original act. On the other hand, the allowance for them falls within the plain meaning of § 2 of the Act of 1906 [49 U.S.C.A. § 6], to which we referred above."

■ Just as the services performed by Sheldon & Co. in that case were not a part of what the carrier was paid for, although undoubtedly resulting in benefit to the carrier, so the services performed by Oliver here, although beneficial to sellers, are no part of what the sellers are paid for, but on the contrary are services rendered the buyers for which they have already paid Oliver. For the sellers to pay for them is for them to pay Oliver for services which Oliver was bound to render the buyers and

which the sellers were under no duty to perform in connection with the sales made. Such payment falls, therefore, within the condemnation of the language used by the Supreme Court in Mitchell Coal & Coke Co. v. P. R. R. Co., 230 U.S. 247, 263, 33 S.Ct. 916, 923, 57 L.Ed. 1472, wherein it was said, "To pay shippers for doing their own work would have been a mere gratuity, and if here the carrier was not bound to haul from the mine, it had no more right to pay these companies for bringing their coal over the spur track to the junction than it would have had to pay a merchant for hauling his goods in a wagon to the railroad depot". See also Merchants' Warehouse Co. v. United States, 283 U.S. 501, 511, 51 S.Ct. 505, 75 L.Ed. 1227. For compensation received by a buyer for services rendered by him or his agent to come within the excepting clause of section 2(c) of the statute, we think that such services must be such as the seller was bound to render in connection with the sale, not such as were performed by the buyer in connection with the purchase or such as were rendered to him by his agent to enable him to purchase.

■ It is argued that the act was directed at the practices of chain stores in using the force of great buying power to obtain these concessions from the seller. It is sufficient answer that the Act makes no distinction as to size and shows no intention to give the small any more than the great the right to receive brokerage commissions on their purchases. Because of the buying power possessed by purchasing agents, whether representing chains or independent dealers, sellers may be willing to allow them brokerage commissions and may consider such commissions earned in the sense that the sellers are thus enabled to sell goods without resorting to other sales devices; but the fact remains that the buyer who receives the brokerage allowed his purchasing agent receives an advantage, and a concealed advantage, which the buyer who purchases directly from the dealer does not receive. It was this sort of discrimination, we think, which it was the purpose of this section of the Act to forbid.

Much argument has been directed to the question as to whether the control exercised by buyers over Oliver is the kind of control contemplated by the statute. This discussion is wholly irrelevant in view of the fact that the commissions are paid to an agent "acting in fact for or in behalf" of

the buyers and are actually received by the buyers themselves. The clause of the statute, "or is subject to the direct or indirect control" is in the alternative and need not be considered when the payment is made to an agent acting "for or in behalf" of the other party, or to the other party himself. Of course, an agent acting for and in behalf of another is under his control; and it was to reach other intermediaries, such as were dealt with in Trunz Pork Stores v. Wallace, 2 Cir., 70 F.2d 688, that Congress inserted the broad alternative provision.

For the reasons stated, the petition to set aside the order of the Commission will be denied, the prayer of the cross-petition will be allowed and decree will be entered enforcing the Commission's order.

Order enforced.