**QUALITY BAKERS OF AMERICA et al. v. FEDERAL TRADE COMMISSION et al.**

No. 3481.

Circuit Court of Appeals, First Circuit.

Sept. 6, 1940.

394

Guy C. Heater, of New York City (Oscar B. Frazer, Arnold L. Davis, and Davis, Wagner, Heater & Hallett, all of New York City, on the brief), for petitioners.

Allen C. Phelps, Sp. Atty., Federal Trade Commission, of Washington, D. C. (W. T. Kelley, Chief Counsel, Federal Trade Commission, of Washington, D. C., on the brief), for respondent Federal Trade Commission.

Before MAGRUDER and MAHONEY, Circuit Judges, and PETERS, District Judge.

PETERS, District Judge.

This is a petition to review and set aside an order of the Federal Trade Commission directing petitioners, Quality Bakers of America, an unincorporated association, and Quality Bakers of America, Inc., a corporation, in connection with the purchase of commodities in interstate commerce by any member of the former or stockholder of the latter, to cease and desist from accepting brokerage fees, or allowances in lieu thereof, and from paying the same, directly or indirectly, to their members and stockholders; and directing other petitioners, certain baking companies, members of the said association, in connection with their purchases of commodities in interstate commerce, to cease and desist from accepting such fees or allowances, in any form, either from sellers from whom they purchase, or from the petitioners, Quality Bakers of America or Quality Bakers of America, Inc.

The order of the Commission was based upon its findings of facts and conclusion that the facts showed a violation of Section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 49 Stat.

1527, 15 U.S.C.A. § 13(c), which reads as follows:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

The complaint of the Commission, initiating the proceeding, alleged that Quality Bakers of America, Inc., accepted for the benefit of its members, respondents in the complaint, and petitioners herein, prohibited brokerage fees and allowances from various sellers of merchandise, including certain flour-mill companies, also named as respondents in the complaint. Subsequently, the Commission dismissed its complaint as against the flour-mill companies for the stated reason that some of them had gone out of business and others had ceased their alleged improper practices and there was no reason to apprehend that they would be renewed, and those companies are no longer parties to the proceeding.

The petitioners, in their answer to the complaint, denied that their business practices constituted any violation of the Clayton Act as amended and also claimed to be exempted from its provisions by Section 4 of the Robinson-Patman Act which provides that a cooperative association shall not be prevented from returning to its members any part of its net earnings in proportion to the business done by them. Constitutionality of the Act as well as the jurisdiction of the Commission is also attacked.

From findings as to the facts made by the Commission, it appears that the voluntary, unincorporated association known as "Quality Bakers of America", having its headquarters in New York City, has a membership comprising some seventy wholesale baking concerns located in various parts of the country, who are and agree to be non-competitive among themselves so long as their membership continues.

The active, operating agent of the association of bakers, referred to as the Association, is a Delaware corporation, organized under the mercantile corporation law of that State and called Quality Bakers of America, Inc. The officers of the corporation and of the Association are the same persons. All the stock of the corporation is owned by members of the Association and cannot be otherwise owned without the consent of the corporation.

The corporation, referred to as the Service Company, acts as purchasing agent for the members of the Association and also renders them various other services and benefits, including assistance in management and services in connection with production, engineering, accounting and advertising.

The lines of merchandise purchased by the Service Company for its stockholders include flour and other food materials, as well as machinery and a variety of equipment and supplies used in the manufacture, storage and distribution of wholesale bakery products. Some of the merchandise is bought outright by the Service Company and resold to its stockholders. In other cases the Service Company as a broker effects the purchase in behalf of the stockholders.

The stockholders of the Service Company, a representative group of whom, together with the corporation and the Association, and their officers, are named as respondents in the complaint of the Commission, are found by the Commission to be, severally, "* * * engaged in purchasing commodities from sellers located in states other than the states in which such Service Company and said stockholders individually maintain their respective principal places of business. Said stockholders, or some of them, daily transmit orders for the purchase of merchandise to respondent Service Company and such orders in nearly every case are transmitted by mail or other means of communication across state lines. In executing said orders and in purchasing the commodities specified therein, respondent Quality Bakers of America, Inc., transmits such orders and purchases commodities from one or more of a group of over 200 manufacturers, processors, producers or distributors, located in many different states, and who in a large ma-

jority of cases are located in a state other than the State of New York, where the Service Company has its principal office and place of business. As a result of such purchase and sale transactions, respondent Quality Bakers of America, Inc., and each of its said stockholders transport or cause to be transported baker's supplies and commodities from the sellers thereof, located in many different states, to, through and into states other than the state of origin or shipment of such commodities. Said stockholders habitually transmit money or the equivalent thereof· in payment of the purchase price for such commodities by United States mail and other means, from their individual places of business, usually across state lines, to the sellers of such merchandise and products, and the Service Company daily receives brokerage fees on purchases made by its stockholders through it, which are transmitted to it by such sellers located in states other than the State of New York, through the medium of the United States mails and otherwise, most of such remittances crossing state lines between the offices of such sellers and the offices of the Service Company. Such purchases by the Service Company's stockholders through the Service Company, and the collection of such brokerage fees by said Service Company, in the manner stated, cannot be accomplished or brought about and is not effectuated except by the use of interstate channels of communication, nor are such commodities so purchased obtained, nor can they be obtained in most cases except by the transportation of the same, at the instance and request of the Service Company and its stockholders, from one state to, into, or through other states of the United States. In using such methods of ordering, purchasing, and making payment for commodities so purchased and in obtaining and collecting such brokerage fees, respondent Service Co. and its stockholders operate in the channels of interstate commerce and are engaged in such commerce. Respondent Service Company is an indispensable interrelated instrumentality in the course of such commerce, and its operations cannot be conducted except by means of the use of facilities available in the channels of interstate trade, communication and commerce. * * * The operations of respondent Service Company are centered in its offices in New York, but extend into every state in which one or more of its stockholders and the sellers of commodities with whom it nego-

tiates purchases of commodities are located. The plan of operation of the Service Company and its stockholders, above described, is an integral whole which cannot be separated into constituent parts without destroying the whole. Said plan of operation contemplates the use of and uses the facilities and instrumentalities of interstate commerce and is effectuated almost entirely through the means and channels of traffic and commerce among and between the several states."

Brokerage fees and commissions collected by the Service Company from the concerns selling merchandise to it or to its stockholders on its order are not paid over to the stockholders directly, the procedure being substantially as follows: The stockholders, members of the Association, agree to pay to the Service Company certain dues, measured by the baking capacity of the member's plant, the minimum being $25 per week. These dues are charged to the several stockholders on the books of the Service Company. The stockholders are also charged with the price of services and benefits rendered to them by the Service Company, including the use of its purchasing department and certain other special services of value to the bakers.

The brokerage fees and commissions collected by the Service Company from the sellers of merchandise, are applied in accordance with the provisions of a so-called membership and service agreement entered into between each member of the Association and the Association and Service Company as follows:

"That all brokerage, selling and commissions, selling discounts or other amounts allowed by suppliers of materials, manufactured advertising, machinery and equipment and collected by the Quality Bakers of America, Inc., shall be applied one-half to the credit of the Member's dues on whose business the brokerage or allowance originated, and the remaining half shall be applied by the Board of Directors in such manner as it shall determine, for service purposes for the benefit of the members of the Quality Bakers of America."

Under the above arrangement, in each case, one-half of the brokerage fee collected by the Service Company is credited on its books to the stockholder whose buying order produced the fee. The other half is used by the Service Company to pay a dividend of 8 per cent on the stock and the operating expenses of the com-

pany including the expense of furnishing to its stockholders the services and benefits above-mentioned.

On the evidence before it, the Commission found that during the year ending July 1, 1937, preceding the service of the complaint in August of that year, the Service Company executed approximately 13,-500 orders for the purchase of commodities on a brokerage-fee basis for its stockholders, the purchase price of such commodities being estimated to be between $5,500,000 and $5,900,000 in amount. On such purchases the Service Company received brokerage fees from the sellers of such commodities totaling $163,933.84. The Commission also found that since July 1, 1937 the Service Company has continued to purchase commodities on a brokerage-fee basis for its stockholders in the same manner and using the same methods as before. The Commission also found:

"In 1936, the dues actually charged to stockholders ranged from nothing for suspended members to $5,920, the latter figure being for a stockholder with five plants. In 1936, of 69 member-stockholders, 36 were credited with more from one-half of the brokerage fees collected by the Service Company on their purchases than the dues charged against them amounted to. In the cases of all but ten of said stockholders, the total brokerage fees collected on purchases made by them through the Service Company exceeded the amount of dues charged against them. During the year 1936 the total amount of brokerage fees collected by the Service Company amounted to $181,528.20; of the amount, $90,760.10 was credited by the Service Company to the respective accounts of its member-stockholders. Dues charged against all the stockholders during 1936 amounted to $79,556."

It also found:

"All of the profits of said company inure to the benefit of the stockholders in the form of money and credits and valuable benefits and services. In all matters and transactions in which the Service Company negotiates or deals with sellers in connection with the purchase of commodities by its stockholders, such Service Company is the agent and representative of such stockholders, acts in fact for them, and in their behalf, and is subject to their direct control."

The conclusion of the Commission was in substance that Quality Bakers of America, Inc., and its stockholders are engaged in interstate commerce "in all material aspects of the practices involved herein"; that in the course of such commerce the corporation is and has been accepting brokerage fees from sellers on purchases of commodities made by its stockholders through it, while acting as the agent for them and in their behalf and while owned and controlled by such stockholders; that the stockholders receive such brokerage fees in the form of money, credits, benefits and services paid for by such fees; that neither the Service Company nor the stockholder renders any service, in connection with the sale commodities, to any seller so paying such fees; that the Association is an organization designed and used to facilitate and further the objectives and operations of the Service Company and its stockholders; that the corporation is not a cooperative association within the meaning of Section 4 of the Robinson-Patman Act, 15 U.S.C.A. § 13b; that the plan of operation and practices of the Association and the corporation and their members result in the transmission of brokerage fees from sellers to buyers on transactions involving the purchase and sale of commodities in the course of interstate commerce and "that such acts, practices and policies are violative of the provisions of paragraph (c) of Section 2 of the Clayton Act, as amended".

As a result of its conclusion, the Commission issued the cease and desist order complained of.

The petitioners take exception to some of the findings of fact made by the Commission.

The act establishing the Federal Trade Commission and providing for a revision of its orders specifies that "The findings of the Commission as to the facts, if supported by evidence, shall be conclusive." U.S.C.A. Tit. 15, Sec. 45(c).

■ The language of that statute is plain enough and the courts have no right to ignore it. "The courts cannot pick and choose bits of evidence to make findings of fact contrary to the findings of the Commission." Federal Trade Commission v. Standard Education Soc., 302 U.S. 112, 117, 58 S.Ct. 113, 116, 82 L.Ed. 141.

■ The weight to be given the evidence as well as the inferences reasonably to be drawn from it, is for the Commission. Federal Trade Commission v. Pa-

cific States Paper Trade Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534; Federal Trade Commission v. Artloom Corp., 3 Cir., 69 F.2d 36.

In view of the above rule and of our desire to curtail this opinion, we deem it unnecessary to discuss all the findings which are objected to, and, where not mentioned, it may be understood that we consider that findings are supported by evidence.

■ Although challenged by the petitioners, it hardly can be questioned, in view of the evidence before the Commission, that the corporation, referred to as the Service Company, has been acting as agent for its stockholders, members of the Association, in extensive transactions involving the purchase of merchandise; that it has been the practice of the Service Company to collect commissions or brokerage fees from the sellers of the merchandise, which are transmitted from other states to the Service Company in New York, which transmits them to the member-stockholders. The stockholders, controlling the corporation, elect to receive the greater part of the brokerage in a form other than cash; but they receive it nevertheless. Such a proceeding (in interstate commerce) is precisely what is prohibited by the statute.

It is contended that the petitioners, so far as the acts complained of here are concerned, are not engaged in interstate commerce, but are engaged in rendering a contractual service that is not interstate commerce. The contractual service referred to is one alleged to be rendered the sellers of merchandise in connection with the sale and purchase of goods, which the petitioners also claim is permissible by the language of the statute.

The only petitioner collecting anything in the nature of a commission directly from the sellers being the Service Company, it is, presumably, that company which is referred to as rendering services under contract. The Commission has found unequivocally that "There is no evidence in the record that the Service Company has contracted with any seller to render him any service in connection with the sale of his commodities or to find buyers for him or to promote the sale of his merchandise." This finding is disputed by the petitioners, but in view of the evidence we think it must stand.

It can be reasonably concluded from the evidence before the Commission that the Service Company was the purchasing agent of the buyers and in that capacity dealt with the sellers. Undoubtedly the sellers received valuable benefits and advantages from the business given them by the Service Company, other than the ordinary profits on the sales. For instance, they were saved the expense incident to obtaining the business and dealing separately with numerous customers taking a large amount of merchandise. In that way and to that extent the Service Company rendered services and had contractual relationship with the sellers. For those benefits the sellers were willing to pay and did pay and, no doubt, after such a course of dealing had been established, it was considered by all parties that there was an implied agreement to pay, but it is a mistake to assume that the payments made were other than essentially commissions on the sales or to suppose that such a practice was lawful after the passage of the Robinson-Patman Act.

■ The petitioners contend that by the language in paragraph (c), above quoted, reading "except for services rendered in connection with the sale or purchase of goods", the Congress recognizes that a buyer, or his agent, may perform services for the seller in connection with the transaction for which the seller may pay and the buyer or his agent receive compensation by way of a brokerage fee or commission on the sale. We do not take such a view of the paragraph. The construction contended for makes much of its language meaningless; it does violence to the purpose of the Act and has been explicitly rejected in other circuits. It is plain enough that the paragraph, taken as a whole, is framed to prohibit the payment of brokerage in any guise by one party to the other, or the other's agent, at the same time expressly recognizing and saving the right of either party to pay his own agent for services rendered in connection with the sale or purchase.

The committee reporting the bill to the H. of R. stated that paragraph.

(c) "* * * permits the payment of compensation by a seller to his broker or agent for services actually rendered in his behalf: Likewise by a buyer to his broker or agent for services in connection with the purchase of goods actually rendered in

his behalf; but it prohibits the direct or indirect payment of brokerage except for such services rendered. It prohibits its allowance by the buyer direct to the seller, or by the seller direct to the buyer; and it prohibits its payment by either to an agent or intermediary acting in fact for or in behalf, or subject to the direct or indirect control, of the other." Report No. 2287, 74th Congress, 2d. Session, March 31, 1936.

This is the view prevailing in other circuits. Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir., 106 F.2d 667; Biddle Purchasing Co. v. Federal Trade Commission, 2 Cir., 96 F.2d 687; Oliver Bros. v. Federal Trade Commission, 4 Cir., 102 F.2d 763; Webb-Crawford v. Federal Trade Commission, 5 Cir., 109 F.2d 268.

■ Even if the Service Company here renders services to the sellers under agreement to do so, as claimed by petitioners, it cannot lawfully collect brokerage fees from the sellers since it is acting as agent for the purchasers. As was stated in the Great Atlantic & Pacific Company case [106 F.2d 674], "The agent cannot serve two masters, simultaneously rendering services in an arm's length transaction to both."

The petitioners also argue that the statute is not applicable to them, and that the Commission was without jurisdiction, because, as they say, the Commission's complaint was based upon payment made by the sellers to the Service Company for services rendered; that such services were rendered by agreement and that the sale of services is not interstate commerce. Several cases, including Hopkins et al. v. United States, 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290, are cited in support of the proposition that "the service contract is separate and distinct from the actual sale in interstate commerce" and not a part of it. The argument proceeds upon a wrong basis. It is misleading to say that the complaint is for accepting money for services rendered. There is no prohibition against an agent's accepting money for services rendered his principal. In fact it is expressly provided for by the language in the statute. The objection is to the acceptance of money for the other party's principal. That is what the complaint charges. Brokerage fees and commissions, so described and admittedly paid before the passage of the Robinson-Patman

Act, are not changed in nature by calling them something else, nor made legal by an agreement for their payment.

■ The point in this connection is whether the parties were engaged in interstate commerce and whether the payments in question were made in the course of such commerce. As to that there can be no serious question. The purchasing stockholders are located in twenty-five different states. The sellers of the commodities purchased are 200 in number and located all over the country. The Service Company either buys outright and re-sells to the stockholders or places orders with the sellers for shipment direct to the purchasers. It all contemplates and requires interstate transportation of merchandise. The fact that intrastate and interstate transactions may be commingled does not restrict the power of Congress to protect and control what is committed to its care. Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441.

Objection is made that the unincorporated association, Quality Bakers of America, is not itself engaged in interstate commerce and should not be included in the cease and desist order.

■ It is true that it does not appear that the Association as such is engaged in commerce, but its members are so engaged, and the Association as an instrumentality in the current of commerce is within the regulatory power of Congress and was properly included in the order. Chamber of Commerce v. Federal Trade Commission, 8 Cir., 13 F.2d 673, 684.

The objection to the jurisdiction of the Commission on the ground that the respondents in the complaint were not engaged in interstate commerce is not well taken.

The petitioners claim to be exempted from the provisions of paragraph (c), above referred to, by Section 4 of the Robinson-Patman Act, 49 Stat. 1528, which reads as follows:

"Nothing in the Act * * * shall prevent a cooperative association from returning to its members, producers, or consumers the whole, or any part of, the net earnings or surplus resulting from its trading operations, in proportion to their purchases or sales from, to, or through the association."

■ The petitioners contend that both the unincorporated association, Quality

Bakers of America and the corporation, Quality Bakers of America, Inc., are cooperative associations within the meaning of the above-quoted section of the statute and have supported their contention with argument, both before the Commission and in his court, but we deem it not necessary to consider whether either or both of the organizations mentioned are cooperatives within the meaning of the statute because we hold that Section 4 does not authorize cooperative associations to engage in the practices forbidden by Section 2(c) of the Act, nor except them from its provisions. There is nothing in the language of the statute which warrants such a conclusion or such a forced construction. The action and debates in Congress to which we have been referred so indicate. Cong.R. Vol. 80, page 8452. See also page 9561.

Paragraph (c) is a distinct and complete provision in itself making illegal the giving or taking of commissions or their equivalent under the circumstances mentioned in the text. There are also in the Act other provisions making other practices illegal as unfair trade practices, but, as it was put by the court in the Oliver case [102 F.2d 767]:

"No reason suggests itself why the limitations and provisions relating to one should be read into those relating to the other."

There are no provisions in Section 4 exempting cooperative associations from the penalties imposed for violation of Section 2(c).

The constitutionality of Section 2 (c) as we have interpreted it is not open to serious question. Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir., 106 F.2d 667; Biddle Purchasing Co. v. Federal Trade Commission, 2 Cir., 96 F.2d 687; Oliver Bros. v. Federal Trade Commission, 4 Cir., 102 F.2d 763; Webb-Crawford v. Commission, 5 Cir., 109 F.2d 268.

In view of the adequate discussion of the constitutional question in these cases, further elaboration of this point would be superfluous.

Some other points made against the action of the Commission have been argued and considered by us but are not regarded as having sufficient merit to require further discussion or to change our conclusion, which is that the order of the Commission should be sustained and the performance of it commanded.

A decree will be entered affirming and enforcing the order of the Federal Trade Commission.