## TRUNZ PORK STORES, Inc., v. WALLACE, Secretary of Agriculture, et al.
### No. 267.

Circuit Court of Appeals, Second Circuit.
April 30, 1934.

Patterson, Eagle, Greenough & Day, of New York City (Carroll G. Walter and A. F. Schaeffner, both of New York City, of counsel), for petitioner.

Wendell Berge, Sp. Asst. to Atty. Gen. (Harold M. Stephens, Asst. Atty. Gen., Carl McFarland, Sp. Asst. to Atty. Gen., and J. Stephen Doyle, Jr., Sp. Atty., of Washington, D. C., of counsel), for respondents.

Before MANTON, LEARNED HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This petition is filed to set aside an order to cease and desist as unfair, discriminatory, and deceptive a practice of petitioner paying a commission, through a broker, on the sale of its pork products to the Great Atlantic & Pacific Tea Company. The order was entered after notice and a hearing, by the Secretary of Agriculture, pursuant to section 203 of the Packers & Stockyards Act of 1921 (42 Stat. 159, 161, 7 USCA § 193). The condemned practice consisted of refunding or remitting brokerage commissions by a broker to the Great Atlantic & Pacific Tea Company.

Petitioner, a New York corporation, admittedly engaged as a packer as defined in title 2 of the Packers & Stockyards Act (7 USCA § 191 et seq.), sold pork products only. Its plant is subject to inspection by the Bureau of Animal Industry of the United States Department of Agriculture. The Great Atlantic & Pacific Tea Company, its customer, retails food and meat products with branch stores throughout the United States, and it arranged for one Noell, a former employee, to become a provision broker in making purchases from petitioner, and he was paid 1 per cent. of the gross purchases.

Noell had experience in the meat business and had charge of the entire purchasing of pork and specialty items for the eastern division of the Great Atlantic & Pacific Tea Company. It was after direct employment with the Great Atlantic & Pacific Tea Company that he established his agency as commission broker. After paying his office expenses and salary, he remitted the balance of the brokerage commission to the Great Atlantic & Pacific Tea Company. His telephone was listed both under his own name and under the name of the Great Atlantic & Pacific Tea Company. He was frequently called upon by other packers, who did not have any representatives in the towns for which he purchased, to see whether he could move products for them. In April, 1932, the Great Atlantic & Pacific Tea Company consented to let Noell purchase for anybody who desired to use his services; prior thereto he had purchased only for it. He still charged the 1 per cent. commission or brokerage fee that he had formerly charged, and it was imposed upon all transactions—those in which he bought for other purchasers as well as those in which he bought for the Great Atlantic & Pacific Tea Company. He would make the purchase, advise the packers to whom they should ship, and they would bill the purchaser direct. In due course he received his commission. About 75 per cent. of his purchases were for the Great Atlantic & Pacific Tea Company. After April, 1932, the name on the door and window of Noell's office, which had read "The Great Atlantic & Pacific Tea Co. Agent, C. J. Noell," was changed. He continued in the same building with the Great Atlantic & Pacific Tea Company.

In February, 1932, the Institute of American Meat Packers, being advised of this practice, made inquiry concerning it, and Noell told them that he would change the practice because the code of the institute forbade doing business this way. A change was made so that the purchase orders were marked "C. J. Noell Packing House Products."

■ Section 202 of the Packers & Stockyards Act (7 USCA § 192) provides that it is unlawful for any packer (a) to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce; or (b) make or give in commerce any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject, in commerce, any particular person or locality to any un-

due or unreasonable prejudice or disadvantage in any respect whatsoever. The act is constitutional. Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229.

It was intended to give to the Secretary of Agriculture the power to regulate intrastate transactions which have become so interwoven with interstate commerce that the effective regulation of the latter incidentally controls the former. The Supreme Court held that Congress had the power to prescribe which practices were likely to burden that commerce which is confined to the protection of the federal government. The Congress has declared by this act that unfair and unjust discriminatory and deceptive practices and undue and unreasonable preferences shall be unlawful. This is predicated upon the theory that the business of the packers per se is that which flows from one part of the country to the other from the producer of live stock to the consumer of its meat products throughout the country. It was thought to be the type of commerce which was one of the purposes of the Constitution to bring under federal protection and control.

■ It is argued that interstate commerce was not involved in the practice ordered stopped, and therefore the Secretary of Agriculture had no power to entertain the order. The complaint against the petitioner charges it with being a packer as defined in title 2 of the Packers & Stockyards Act (7 USCA § 191 et seq.). This allegation it admits. A packer is one who engages in commerce in meats. 42 Stat. 159, 160, § 201 (7 USCA § 191). Necessarily, a packer is deemed to be engaged in interstate commerce, for Congress has lawfully legislated with reference to such commerce. Stafford v. Wallace, supra. Petitioner, admitting by its answer that it is a packer, and that it prepares meats and meat food products for sale and shipment in commerce, comes within the definition of a packer.

■ The practice followed may well have been considered discriminatory and deceptive and therefore violative of the act. By the payment of the commission, the Great Atlantic & Pacific Tea Company received an advantage over competitors. The plan of breaching the statute was ingenious. Noell was set up as an independent broker, but the Great Atlantic & Pacific Tea Company advanced wages and expenses. It was reimbursed for its expenditures through the 1

per cent. commission, and was paid the surplus. Ostensibly it had the appearance of buying through an independent broker as was the practice in the trade. The petitioner knew Noell was turning over to the Great Atlantic & Pacific Tea Company what was left of the commission after paying his expenses. Petitioner was a member of the Institute of American Meat Packers and subscribed to its code, and it was easy for the petitioner to have known, as we think it did know, that Noell was not a bona fide broker conducting his business as other brokers did.

The evils involved were that not only did the Great Atlantic & Pacific Tea Company receive its purchases at lower prices than competitors, but it shared in the commissions on products sold by competitors. Through the method followed, it practiced a deceit on competitors who did not know the Great Atlantic & Pacific Tea Company was sharing in such commissions from Noell. But the petitioner argues that the Great Atlantic & Pacific Tea Company could, if it so desired, have entered the brokerage business. It refers us to cases holding that under some circumstances a common carrier (forbidden by the Interstate Commerce Act to rebate or give advantages, section 3, c. 104, 24 Stat. 379, 380, as amended (49 USCA § 3 (1) may use facilities owned by the shippers and allow the shippers a refund of part of the regular transportation charge as compensation for such use. The use of such facilities has been justified upon grounds of necessity or expediency. If a carrier fails to make delivery and the consignee through its own instrumentality completes the work, an allowance may be made. U. S. v. B. & O. R. R. Co., 231 U. S. 274, 34 S. Ct. 75, 58 L. Ed. 218; I. C. C. v. Diffenbaugh, 222 U. S. 42, 32 S. Ct. 22, 56 L. Ed. 83. In these cases the shipper was performing, with its own facilities, part of the transportation service. Transportation includes delivery. The limits of the place within which delivery is due varies with varying conditions. Mitchell Coal & Coke Co. v. Penn. R. R. Co., 230 U. S. 247, 33 S. Ct. 916, 57 L. Ed. 1472. There must be such delivery as is customary and reasonable. A distinction is to be drawn between transportation services rendered by shippers for carriers and the internal use of plant facilities. General Electric Co. v. N. Y. C. & H. R. R. Co., 14 I. C. C. 237; Solvay Process Co. v. D. L. & W. R. R. Co., 14 I. C. C. 246; Crane Iron Works v. U. S. (Com. Ct.) 209 F. 238; The Los Angeles Switching Case, 234 U. S. 294, 34 S. Ct. 814, 58 L. Ed. 1319; The Tap Line Cases (U. S. v. Louisiana & P. R. Co.) 234 U. S. 1, 34 S. Ct. 741, 58 L. Ed. 1185.

It has been the policy of the law to prohibit violations of provisions against preferences and discriminations. Southern Ry. Co. v. Prescott, 240 U. S. 632, 36 S. Ct. 469, 60 L. Ed. 836. Noell's commission is not analogous to allowances made by carriers to shippers on account of the use of facilities of the shippers by the carriers rendering transportation service. Noell performed no service to the petitioner; his service was unquestionably for the benefit of the Great Atlantic & Pacific Tea Company. He did not search for a buyer in making sales of petitioner's products as an independent broker might be obliged to do. And even assuming that the Great Atlantic & Pacific Tea Company was engaged in the brokerage business, it is difficult to say that there was any real service performed by Noell for which 1 per cent. commission could properly be paid.

Penn Refining Co. v. Western N. Y. & P. R. Co., 208 U. S. 208, 28 S. Ct. 268, 52 L. Ed. 456, referred to by the petitioner, is distinguishable. Here there is no evidence that other buyers from the petitioner had any reason to believe that the Great Atlantic & Pacific Tea Company was purchasing at a lower price by virtue of its scheme, and it does not appear that the petitioner had ever offered to sell to any other buyers under a similar scheme at a lower price, while in Penn Refining Co. v. Western N. Y. & P. R. R. Co., supra, it was clear that the competitors of the shippers, who obtained the preferable rate, were aware of the special rate, and it was also shown that competitors could not have economically used the type of transportation which was furnished at the lower rate. Larger buyers could adopt a similar deceptive practice and likewise collect commissions paid by petitioner to their ostensibly independent brokers. But the fact that other buyers could profit by similar deceptive practices is no justification for its use. Fed. Trade Comm. v. R. F. Keppel & Bro., 54 S. Ct. 423, 78 L. Ed. ——, decided February 5, 1934.

▆ We think the Secretary of Agriculture's finding of the facts here involved justifies his conclusion. United States v. Donahue Bros., 59 F.(2d) 1019 (C. C. A. 8); Denver Union Stock Yard v. United States (D. C.) 57 F.(2d) 735. There was no taking of property without due process of law nor was there a denial of equal protection of the law. In entering the order, the Secretary, after a hearing, held that there was a deceptive prac-

tice, and full opportunity was given to the petitioner to make answer. The first paragraph of the order should be modified to provide that the refunding it is ordered to cease and desist from shall be that which the respondent Trunz Pork Stores, Inc., shall know or have reason to believe is being made.

Order modified.