## BIDDLE PURCHASING CO. et al. v. FEDERAL TRADE COMMISSION.

### No. 205.

Circuit Court of Appeals, Second Circuit.

May 2, 1938.

Davies, Richberg, Beebe, Busick & Richardson, of Washington, D. C., and Kaufman & Weitzner, of New York City (Raymond N. Beebe and Adrien F. Busick, both of Washington, D. C., and Samuel H. Kaufman, of New York City, of counsel), for petitioners.

W. T. Kelley, Chief Counsel, Federal Trade Commission, of Washington, D. C., and Allen C. Phelps, Sp. Atty., Federal Trade Commission, of Brush, Colo., for respondent.

Felix H. Levy, of New York City (Felix H. Levy, J. G. L. Molloy, George B. Levy, and John D. Swartz, all of New York City, of counsel), amici curiæ.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

Complaint was issued by the Federal Trade Commission, charging petitioners with violating the provisions of the Clayton Act as amended by section 2(c) of the Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(c). Petitioner Biddle Purchasing Company is in the brokerage business as herein described. Some of the petitioners are buyers, while others are sellers of commodities bought and sold in interstate commerce through the Biddle Company as brokers. The sellers were charged with unlawfully paying brokerage fees to the Biddle Company for the use of buyers of the commodities in interstate commerce.

The order appealed from provides that the Biddle Company, "its officers, representatives, agents and employees, in connection with the purchase or sale of commodities in interstate commerce or in the district of Columbia, do forthwith cease and desist from: (1) Receiving or accepting any fee or commission, as brokerage or as an allowance in lieu thereof, from any seller of commodities, which fee or

commission is intended to be paid over to the purchaser of such commodities, or which is to be applied for the use and benefit of such purchaser; (2) Paying or granting to any purchaser of commodities any fee or commission received or accepted by said Biddle Purchasing Company, as brokerage or an allowance in lieu thereof, from the seller of such commodities."

The Commission found that those of the petitioners who were sellers violated section 2(c) of the Robinson-Patman Act by paying brokerage fees to petitioner Biddle Company, with knowledge of the fact that the fees were intended to be and were being paid over by said Biddle Company to its buyers; that the buyers were violating the statute by receiving and accepting brokerage fees paid by the sellers in connection with the purchase of commodities by said buyers, through the Biddle Company; and that the latter was violating the statute by accepting such fees and transmitting them to the buyers.

Section 2(c) of the Robinson-Patman Act provides that "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

Biddle Company's business method was to obtain subscribers to its combined market information and purchasing service charging therefor from $25 to $50 per month. It provides a trade information and purchasing service for wholesalers and jobbers throughout the country. It also is engaged in selling the products of numerous manufacturers, canners, and packers to the concerns for whom it supplies market information and purchasing service. Biddle Company has written contracts with the buyers. With the sellers oral contracts to dispose of their products were made under which the commissions were paid to Biddle which in turn paid them over to the buyer of the particular commodity. In about 86 per cent. of these transactions the buyers received back as commissions no more than the amount they had paid to the Biddle Company for its market information service, but in 14 per cent. the commissions exceeded that sum and this excess was paid to the buyers. Large numbers of buyers subscribe to its service. It has sold for many sellers. The Biddle Company is not controlled by or affiliated with either buyers or sellers through stock ownership, but is an independent corporation. This method of transacting business, with the remission of the selling commissions to the buyers, in effect, gives the buyer a discount on his purchase.

█ The regulation of competition results in a competitive etiquette, in standards of business conduct, in a plane of competition. Trusts were forbidden because they stifled competition and tended to create monopoly. The prohibitions of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, set a plane of monopolistic conduct rather than a plane of competition. Anti-trust laws regulate monopolistic practices which are repugnant to decent business morality, which are injurious to competitors and to consumers, which are economically wasteful but which do not jeopardize to an appreciable degree the very existence of competition. Both types of practice must be included in the legal plane of competition; both are types of regulation which enforce each other; both are animated by a common objective notwithstanding the differences of their intermediate ends. Monopolistic purpose and intent (Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518) are illustrated by decisions as in Standard Oil Company Case, Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, where the Oil Company was engaged in local price cutting and espionage, established bogus independents, and granted rebates to preferred customers and exacted rebates and preferences from railroads, all for the purpose of suppressing competition. And the American Tobacco Company v. United States, see 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, employed fighting brands for the same purpose. The United States v. International Harvester Company, D.C., 214 F. 987, appeal dismissed 248 U.S. 587, 39 S.Ct. 5, 63 L.Ed. 434; Id., 274 U.S. 693, 47 S.Ct. 748, 71

L.Ed. 1302, closed the channel of trade to competitors by tying up all the main retail outlets with exclusive dealing contracts. It is reasonably clear that most of these methods violated the Sherman Anti-Trust Act only when they were part of a scheme to stifle competition and to obtain control of an industry.

Resale price maintenance has received fuller consideration than any of the other selling devices challenged under the anti-trust laws. Agreements maintaining resale prices have been condemned as a restraint of trade. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A. 1917E, 1196, Ann.Cas.1918A, 955. And as an unfair method of competition under the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., see, Federal Trade Comm. v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; J. W. Kobi Co. v. Federal Trade Comm., 2 Cir., 23 F.2d 41. The injury, if any, resulting from price maintenance, is suffered not by the competitors of the producer but by the retailer and the ultimate consumer. The courts draw the distinction between price maintenance by agreement and price maintenance by refusing to deal. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443. Cf. Frey & Son, Inc. v. Cudahy Packing Co., 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892.

Thus the rules governing the maintenance of prices must be included in any discussion of unfair competition, although the problem is somewhat different from other trade practices. But the Clayton Act, 38 Stat. 730, singled out two practices for special treatment, price discrimination and exclusive dealing and other tying agreements. Section 2 forbids discriminations in price not based upon differences in grade, quality, quantity, or cost of transportation which substantially lessen competition or tend to create a monopoly in any line of commerce. The section outlaws unfair discriminations which substantially lessens competition or lead to monopoly. It does not compel a one-price sales policy. It does not forbid sales below cost in the absence of discrimination. Porto Rican American Tobacco Co. v. American Tobacco Co., 2 Cir., 30 F.2d 234.

The amendment in section 2(a), 15 U.S.C.A. § 13(a), has for its purpose making discrimination in prices unlawful "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them."

It is argued that section 2(c), 15 U.S.C.A. § 13(a), under which this proceeding is brought, is to be construed in the light of section 2(a), and that, so construed, the payment or receipt of the brokerage is illegal only when it has such effect upon competition as is provided in section 2(a). The argument is that the receipt of brokerage here would be illegal only if it restricts competition or restrains trade or injures a competitor. But no complaint is made against Biddle Company or the other petitioners for this reason. The complaint here is under the provisions of section 2(c) and not section 2(a) of the statute. The validity of the order entered is dependent entirely upon the legality of section 2(c). Section 2(c) contains no classification provision nor is there anything in it which would justify the conclusion that it would not be uniformly applied. It in no way supports the theory that the relative size of businesses coming within its purview or other differing plans of organization determine the question as to whether or not violations of the statute occur.

Petitioners say that, if section 2(c) is construed to prohibit the payment or receipt of brokerage irrespective of a finding of injurious effect on competition, then section 2(c) deprives petitioners of their right to make usual and ordinary contracts for the disposition of property and services without due process of law contrary to the Fifth Amendment of the Constitution U.S.C.A. Const.Amend 5. While the Biddle Company was disassociated in ownership and management from either buyers or sellers, direct and indirect control can be exercised by buyers or sellers over a broker in transactions of purchase and sale by means other than participation in the broker's ownership and management. In the purchasing transactions which the Biddle Company executes for its buyers, it is the agent and representative of the buyers, and

is therefore to that extent subject to their control. The fact that the buyers do not own some or all of the stock of the Biddle Company does not negative the fact that the Biddle Company is under their control when so employed.

Biddle Company's vice president testified that its entire income is derived from the monthly service charges. "Everything we get in buying we turn back to our clients. We are not dependent on sales. We are dependent on getting orders from people. They are important to us, because it is through the placing of their orders that we get the touch of the market that is so necessary, but we have no immediate interest as regards immediate income from that source."

· By the terms of the contract, the buyer "employs Biddle Purchasing Company of New York to purchase such material as they may order from time to time within reasonable credit limits and agrees to pay Biddle Purchasing Co. for such services $———."·

Such is the contract of employment which makes the Biddle Company a purchasing agent for the buyers.

It is clear that the statute prohibits payment of brokerage by the seller to the buyer or his agent or representative or controlled intermediary except for services rendered. Congress intended to prohibit such payments as an unfair trade practice. The report of the House and Senate Conference Committee, submitted in referring the bill in its present form, interprets the section as having this meaning[1]. It is manifest that the words "except for services rendered in connection with the sale or purchase of goods" prohibit payments which were made here to the buyers.

It is argued that the Biddle Company is a true intermediary and that under the statute it can represent and collect compensation from both buyer and seller. The Commission, on the other hand, ▓▓▓▓▓ that the statute does not permit s▓▓▓ ▓▓▓

arrangement. We need not decide that question, since the evidence shows that Biddle Company receives its compensation solely from the buyers. What it receives from the sellers is not retained by it but merely passed on to the buyers or credited to their account.

Congress must have intended that payments by sellers should not be made to buyers through any one acting as agent for the buyer. Significance and effect must, if possible, be accorded to every part of the act. United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658, L.R.A.1915B, 774. In the last phrase of the section "either to the other party" etc., the description of the persons to whom it is unlawful to pay brokerage fees is not separable into constituent parts, and hence this clause stands in its entirety or falls altogether. It may not be said that payments to buyers are in any different category than those to agents or those who act for or under the control of the buyers. If buyers' agents or intermediaries are excepted for services rendered, so too are the buyers themselves. The intent of Congress must be recognized and applied and this may best be given effect by a construction of the phrase "except for services rendered" that will harmonize with the remainder of the section. As the House and Senate Committees said, the intermediary is entitled to nothing more than "appropriate compensation by the one in those interest he so serves," and one who acts in such capacity may not receive fees from the seller when he is under contract and does in fact turn over such fees to the buyer. Cf. Lehigh Valley R. Co. v. United States, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839; Union Pac. R. Co., v. Updike Grain Co., 222 U.S. 215, 32 S.Ct. 39, 56 L.Ed. 171; Interstate Commerce Comm. v. F. H. Peavey & Co., 222 U.S. 42, 32 S.Ct. 22, 56 L.Ed. 83. Indeed, the brokerage fees by the sellers to the Biddle Company could not be made ▓▓▓ good faith as compensation for services rendered, since the fees are intend-

---

[1] "This subsection permits the pa▓▓▓▓▓ of compensation by a seller to his b▓▓▓ ▓ or agent for services actually rende▓▓▓ ▓▓ his behalf; likewise by a buyer ▓▓ ▓▓▓ broker or agent for services in conn▓▓▓▓▓▓ with the purchase of goods actuall▓ ▓▓▓ dered in his behalf; but it prohib▓▓▓ ▓▓▓ direct or indirect payment of br▓▓▓▓▓▓ except for such services render▓▓ ▓▓ ▓rohibits its allowance by the buyer direct to the seller, or by the seller direct to the buyer; and it prohibits its payment by either to an agent or intermediary acting in fact for or in behalf, or subject to the direct or indirect control of the other." House Rep., 2951, 74th Congress, 2d Session. ·

ed for the buyers and are immediately transmitted to them.

The Fifth Amendment of the Constitution, U.S.C.A. Const.Amend. 5, does not prohibit governmental regulation for the public welfare. The guaranty of due process merely demands that the law shall not be unreasonable, arbitrary, or capricious and that the means selected shall have a real and substantial relation to the objects sought to be obtained. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 512, 78 L.Ed. 940, 89 A.L.R. 1469. Congress has the power to regulate 'commerce and this gives it power to enact " 'all appropriate legislation' for its 'protection and advancement' * * * to adopt measures 'to promote its growth and insure its safety,' * * * 'protect, control, and restrain.' " U.S.C.A. Const. art. 1, § 8, cl. 3. Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 433, 74 L.Ed. 1034. It may be exercised to protect interstate commerce from dangers which threaten it. Kentucky Whip & Collar Co. v. Ill. Central R. Co., 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352. A practice which threatens to obstruct or unduly burden the freedom of interstate commerce is within the regulatory powers of Congress under the commerce clause. If Congress decides the fact of danger, it may meet it by legislation. Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229.

The right of freedom or liberty of contract guaranteed by the Fifth Amendment to the Federal Constitution does not proscribe the exercise by Congress of its power to regulate commerce in derogation of that right. Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524. As said in Nebbia v. New York, supra: "Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws bidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of price discrimination. The public policy with respect to free competition has engendered state and federal statutes prohibiting monopolies, which have been upheld."

Congress may have had in mind that one of the principal evils inherent in the payment of brokerage fees by the seller to the buyer directly or through an intermediary, is the fact that this practice makes it possible for the seller to discriminate in price without seeming to do so. If a price discount is given as a brokerage payment to a controlled intermediary, it may be and often is concealed from other customers of the seller. One of the main objectives of section 2(c) was to force price discriminations out into the open where they would be subject to the scrutiny of those interested, particularly competing buyers. See Trunz Pork Stores v. Wallace, 2 Cir., 70 F.2d 688. The order entered is responsive to and justified by the findings of the Commission and satisfies the requirements of due process.

Petitioners refer to Fairmont Creamery Co. v. Minn., 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893, 52 A.L.R. 163, which recognizes the distinction between prohibition and regulation. The rule of that case is not inconsistent with the principle here announced. Section 2(c) was clearly intended to restore equality of opportunity in business by strengthening the anti-trust laws through protecting trade and commerce against unfair practices and unlawful price discrimination. The power of Congress to define this trade practice and declare it to be unfair cannot be doubted. Federal Trade Comm. v. Keppel & Bro., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814.

Petition denied.

SWAN, Circuit Judge (dissenting).

For reasons which may be briefly stated, I am unable to concur in the opinion of the court.

For an agreed monthly subscription price the Biddle Purchasing Company supplies a market informational and purchasing service to some 2,400 subscribers (wholesalers and distributers). The Biddle Company keeps in touch with about 5,000 producers and gets prices and other market information which it transmits to its subscribers. When a subscriber desires to make a purchase, he informs Biddle Company of his need, and the price he wants to pay, and Biddle Company sends the order to one of the producers, who ships and bills the goods direct to the subscriber. The seller pays Biddle Company a brokerage commission on the sale, and

this is credited to the subscriber in reduction of the subscription price agreed to be paid for Biddle Company's service. About 14 per cent. of the subscribers receive cash remittances after their subscriptions have been completely paid for by the crediting of commissions.

The Commission has found that Biddle Company does not act for the sellers but only for its subscribers. In my opinion this finding cannot be sustained. Biddle Company performs a regular brokerage service for the sellers and receives the same fee as they pay other brokers for a similar service. The fact that in many instances Biddle Company selects the seller, since the subscriber frequently does not designate from whom to buy, shows clearly that Biddle Company performs a service for the seller. It performs a further service in bringing the seller's products and prices to the attention of the subscribers, even though no sale immediately results. Biddle Company also performs a service for the buyer by supplying market information in addition to the purchasing service when an order is placed. Unless the statute forbids it, there could be no objection to the Biddle Company getting the customary brokerage from the seller and also a fee from the buyer, since the parties know that it is to be compensated by both. In other words, if Biddle Company kept the commissions paid by the sellers, the statute would not forbid it. It would be within the exception "for services rendered." Section 1(c) of the Robinson-Patman Price Discrimination Act, 49 Stat. 1526, 15 U.S.C.A. § 13(c) though ungrammatically phrased, expresses the intention to forbid a seller from paying a brokerage fee to a buyer or his agent unless the payee renders some service to the seller. Its object is to prevent unfair competitive conditions which are created when a buyer gets a lower price than competitors in the guise of a commission paid to the buyer or to some agent or dummy. In my opinion, it was not intended to eliminate such a business as the Biddle Company does for 86 per cent. of its subscribers. Their goods cost them as much as their competitors would pay for the same goods. In addition, they pay something to Biddle Company for the service it renders them. In effect, the arrangement is that the Biddle Company will charge for its informational and purchasing service the difference between what it collects from sellers as brokerage on orders placed by the subscriber, and the monthly subscription price. This means that different subscribers pay different sums for the Biddle service, and the less they order through the Biddle Company the more they pay for informational and purchasing service, but I see nothing in the statute forbidding that. Only when the Biddle Company pays over brokerage fees in excess of the subscriber's subscription price does the buyer get a discriminatory rebate which gives him an advantage over a competitor who does not take the Biddle service. It seems to me that the statute should be construed to forbid Biddle Company's method of doing business only with respect to the 14 per cent. of its customers who really get a price reduction on the goods through the commissions paid Biddle Company by the sellers. Such a construction will save a legitimate and useful business which has existed for half a century, and one which I do not believe Congress intended to outlaw by the statute in question.

I think the order of the Commission should be vacated except in so far as it forbids the Biddle Company from paying over to a subscriber any excess of commissions above the subscription price of the service.