369 F.3d 212
 BLUE TREE HOTELS INVESTMENT (CANADA), LTD., Edmonton Plaza Hotel, Inc., Caesar Park Hotels & Resorts Tucson Co. and Caesar Park Hotels & Resorts Hilton Head Ltd. Partnership, Plaintiffs-Appellants,
v.
STARWOOD HOTELS & RESORTS WORLDWIDE, INC., Starwood Hotels & Resorts, Westin Canada Management Co., Westin Ottawa Management Co. and Westin North America Management Co., Defendants-Appellees.
 Docket No. 02-9312.
 United States Court of Appeals, Second Circuit.
 Argued May 27, 2003.
 Decided May 20, 2004.
 
 COPYRIGHT MATERIAL OMITTED Cecelia L. Fanelli, Stroock & Stroock & Lavan, LLP (Bruce H. Schneider, on the brief), New York, NY, for Plaintiffs-Appellants
 Daniel Brown (William A. Brewer III, James S. Renard, Jeremy R. Wilson, Bickel & Brewer, on the brief), New York, NY, for Defendants-Appellees
 Before: WALKER, Chief Judge, CALABRESI, Circuit Judge, and KORMAN, Chief Judge.*
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Plaintiffs-appellants Blue Tree Hotels Investment (Canada), Ltd., Edmonton Plaza Hotel, Inc., Caesar Park Hotels & Resorts Tucson Company, and Caesar Park Hotels & Resorts Hilton Head Limited Partnership (collectively, "Blue Tree Owners") are owners of seven Westin Hotels in Canada and the United States ("Hotels"). Defendants-appellees Starwood Hotels & Resorts Worldwide, Inc., Starwood Hotels & Resorts, Westin Canada Management Co., Westin Ottawa Management Co., and Westin North America Management Co. (collectively, "Starwood") are a group of related companies that own and/or manage numerous hotels throughout the world (including Westin Hotels, W Hotels, Four Points Hotels, St. Regis Hotels, and Sheraton Hotels). In a complaint filed pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15(a), the Blue Tree Owners alleged that Starwood, acting in its capacity as the manager of their Hotels, has engaged in commercial bribery by receiving and retaining various rebates and discounts in connection with its purchasing activities on behalf of the Hotels and the other hotels Starwood owns and/or manages. Asserting that this conduct violates § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), the Blue Tree Owners claim treble damages and attorneys' fees.
 
 
 2
 The United States District Court for the Southern District of New York (Charles L. Brieant, Jr., District Judge) entered judgment dismissing the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The district court ruled that the Blue Tree Owners lacked standing to seek treble damages for the alleged violation, concluding that the only parties who would be able to allege an antitrust injury arising from this type of § 2(c) violation would be vendors who directly compete with the vendors who paid the alleged commercial bribes to Starwood. The Blue Tree Owners appeal.
 
 
 3
 While we conclude that the district court erred in holding that proof of competitive injury was a necessary component of a § 2(c) violation, we nevertheless find that appellants have failed to allege a violation of § 2(c). Accordingly, we affirm the district court's dismissal of the complaint.
 
 BACKGROUND
 
 4
 In 1995, Starwood purchased the entire chain of Westin hotels with the exception of the Hotels owned by the Blue Tree Owners. Prior to Starwood's purchase of the Westin chain, each of the Blue Tree Owners had entered into management agreements (the "Management Agreements") with the Westin Hotel Company ("Westin"), pursuant to which Westin operated the Hotels on behalf of the Blue Tree Owners. As part of its purchase of the Westin chain, Starwood acquired Westin's interest in the Management Agreements.
 
 
 5
 Under the Management Agreements, Starwood is obligated to operate the Hotels on behalf of the Blue Tree Owners in exchange for management fees, reimbursement for expenses incurred by Starwood for the Blue Tree Owners' accounts, and payment of a percentage of the Westin chain's overhead costs. Each Management Agreement grants Starwood discretion to purchase for the Hotels any operating supplies and fixtures it deems advisable. In addition, all but one of the Management Agreements permit Starwood to "implement [its] standard administrative, accounting, budgeting, marketing, personnel, and operational policies and practices relating to or affecting hotel operations, as those policies may be amended from time to time, but all of which [the Blue Tree Owners] agree [] to accept."
 
 
 6
 In July 2000, Starwood filed a complaint against the Blue Tree Owners in New York State Supreme Court asserting several claims, including breach of contract, tortious interference with business relationships, and fraud.[1] In October 2000, the Blue Tree Owners and others filed a complaint against Starwood, also in New York State Supreme Court, asserting claims of commercial bribery, fraud, negligent misrepresentation, conversion, breach of contract, and breach of fiduciary duty.[2] As of the date of oral argument in this case, both of these state court cases were still pending.
 
 
 7
 The Blue Tree Owners filed this federal action in April 2002, asserting a private antitrust claim pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15(a), based on allegations that Starwood has engaged in a commercial bribery scheme that violates § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c). Specifically, the Blue Tree Owners allege that (1) one of Starwood's responsibilities under the Management Agreements is to act as a purchasing agent for the Hotels; (2) it performs such purchasing activities in conjunction with its purchases for the other hotels it owns or manages; (3) it has "entered into agreements with vendors to provide the Hotels with the goods, wares and merchandise that the Hotels require"; and (4) pursuant to these agreements, Starwood has "sought and obtained undisclosed Kickbacks" from the vendors, thereby engaging in an "unlawful Kickback scheme." The Blue Tree Owners define these "Kickbacks" as "allowances, bonuses, charges, commissions, credits, discounts, fees, incentives, profits, rebates, and/or kickbacks."
 
 
 8
 The Blue Tree Owners acknowledge that they have no involvement in or control over the negotiation and execution of the purchasing agreements between Starwood and its vendors. They complain, however, that Starwood has "intentionally failed to disclose and/or fraudulently concealed [its] receipt and retention of [the] Kickbacks [as well as] the amount of Kickbacks [it has] received and retained in the aggregate, and with respect to each of the Hotels individually." In addition, the Blue Tree Owners allege, Starwood "intended to retain [and] did retain ... the Kickbacks for [its] own account and to profit therefrom to the detriment of the Hotels and in violation of [its fiduciary] duties and obligations to [the Blue Tree Owners]."
 
 
 9
 The complaint further alleges that, as a consequence of the "Kickback scheme," Starwood is acting as a "dishonest competitor[]" because the Hotels compete with the other hotels Starwood owns and manages, including the Westin and Sheraton brands. The Blue Tree Owners assert that they have been injured by the "Kickback scheme" because (1) it has deprived them of the opportunity to obtain advantageous prices and terms that would otherwise be available from vendors who did not participate in the "Kickback scheme"; and (2) it has increased the cost of goods to the Blue Tree Owners while simultaneously reducing the cost of goods and generating profits for Starwood. The Blue Tree Owners seek treble damages and attorneys' fees. They also seek permanent injunctive relief prohibiting Starwood from continuing (a) to obtain and retain "Kickbacks" and (b) to impede the Blue Tree Owners' access to the Hotels' financial and operating information.
 
 
 10
 Attached to the complaint are copies of the seven Management Agreements, as well as a series of letters dating from December 1998 to June 2000 that were sent on behalf of the Blue Tree Owners to Starwood and its accountants. The initial letters sent to Starwood in 1998 and 1999 requested information concerning, inter alia, Starwood's "[t]reatment of [r]ebates and [c]ommissions," including the total amount of rebates, "the way in which Starwood expects to use rebates to offset the cost of [Starwood's] purchasing function," and the proportion of rebates that would be allocated to the Hotel's marketing fund. In subsequent letters to Starwood, the Blue Tree Owners objected to Starwood's retention of rebates and other compensation it obtained from its purchasing activities, asserting that "rebates are owned by the [Blue Tree Owners]."
 
 
 11
 In May 2002, Starwood moved to dismiss the complaint. The district court granted Starwood's motion on the ground that, as a matter of law, the Blue Tree Owners did not have standing to pursue a § 2(c) claim based on the alleged commercial bribery scheme. As an initial matter, the district court noted that whether commercial bribery falls within the ambit of § 2(c) was an open question in this circuit. On the assumption that § 2(c) comprehends commercial bribery, however, the district court held that a plaintiff seeking to file a private cause of action for treble damages and attorneys' fees would nevertheless have to allege an antitrust injury in accordance with the requirements of § 4 of the Clayton Act, because § 2(c) does not itself create a private cause of action.
 
 
 12
 Next the district court observed that the legislative history of the Robinson-Patman Act showed that § 2(c) "was enacted to remedy ... [t]he abuses ... [of] price discrimination obtained through brokerage schemes[] and the unfair advantage over a competing seller who could not or would not pay kickbacks." The district court concluded that in light of this purpose, the only plaintiffs with standing to file a private action based on the alleged scheme would be the vendors of hotel supplies who directly competed with the vendors who paid the "Kickbacks" to Starwood. The district court reasoned that competing vendors would be the only parties who could allege an antitrust injury as a result of the competitive advantage obtained by the vendors who paid "Kickbacks." Finding that the Blue Tree Owners could not assert such an antitrust injury, the district court dismissed their complaint for failure to state a federal claim upon which relief can be granted. The Blue Tree Owners appealed.
 
 DISCUSSION
 I. Standard of Review
 
 13
 Our review of a district court's dismissal of a complaint pursuant to Fed.R.Civ.P. 12(b)(6) is de novo. Gryl v. Shire Pharm. Group PLC, 298 F.3d 136, 140 (2d Cir.2002). In ruling on the sufficiency of the complaint, we must accept as true the allegations contained in the complaint and draw all reasonable inferences in favor of the nonmoving party. See id. Our review is generally limited to the facts and allegations that are contained in the complaint and in any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits. See Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir.2002); Chambers v. Time Warner, Inc., 282 F.3d 147, 152-54 (2d Cir.2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir.1999). But we may also look to public records, including complaints filed in state court, in deciding a motion to dismiss. See Taylor, 313 F.3d at 776; Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir.1998). A dismissal pursuant to Rule 12(b)(6) "is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir.2000).
 
 
 14
 On appeal, the Blue Tree Owners contend that the district court erred in concluding that they lacked standing to bring a claim for violation of § 2(c) of the Robinson-Patman Act on the basis of the alleged commercial bribery. They assert that (1) commercial bribery constitutes a per se violation of § 2(c); (2) § 2(c) does not require proof of competitive injury; and (3) even if competitive injury is required for a private action under § 2(c), appellants alleged competitive injury in their complaint. Addressing these arguments, we conclude that, while the district court did err in imposing a competitive injury requirement, the complaint was nevertheless properly dismissed because it fails to allege a violation of § 2(c) on the basis of commercial bribery or otherwise.
 
 II. The Robinson-Patman Act
 
 15
 Section 2(c) of the Robinson-Patman Act provides
 
 
 16
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.
 
 
 17
 15 U.S.C. § 13(c). As Justice Frankfurter observed in Automatic Canteen Co. of Am. v. FTC, 346 U.S. 61, 65, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953), "precision of expression is not an outstanding characteristic of the Robinson-Patman Act." Nevertheless, the statute appears to parse out as follows:
 
 It is unlawful for any person to
 
 18
 (1) pay (or receive) —
 
 
 19
 a. anything of value as a commission, brokerage, or other compensation, or
 
 
 20
 b. any allowance or discount in lieu of brokerage,
 
 
 21
 except for services rendered in connection with a sale or purchase of goods,
 
 
 22
 (2) when the payment is made to (or by)
 
 
 23
 a. the other party to the transaction, or
 
 
 24
 b. an agent, representative or other intermediary where the intermediary is
 
 
 25
 (i) acting for or in behalf of, or
 
 
 26
 (ii) subject to the direct or indirect control of
 
 
 27
 any party to the transaction other than the person by whom the compensation is paid.
 
 
 28
 Although the Robinson-Patman Act has frequently been the subject of enforcement actions by the Federal Trade Commission, see, e.g., FTC v. Henry Broch & Co., 363 U.S. 166, 168-69, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960); Biddle Purchasing Co. v. FTC, 96 F.2d 687, 690-92 (2d Cir.1938), it does not itself provide a private right of action for treble damages. Such a right is granted only by § 4 of the Clayton Act, 15 U.S.C. § 15(a), which authorizes private suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." Schwimmer v. Sony Corp. of Am., 637 F.2d 41, 46 (2d Cir.1980) (holding that standing to raise a claim under § 2(a) of Robinson-Patman Act "is derived from Section 4 of the Clayton Act"); see also J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 568, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).
 
 
 29
 III. Antitrust Injury and Standing Under Robinson-Patman
 
 
 30
 In dismissing the Blue Tree Owners' complaint, the district court held that the only plaintiffs who would have standing to sue for the alleged § 2(c) violation arising from the challenged vendor payments would be those vendors of hotel supplies who directly compete with the vendors who made the payments. We agree with the Blue Tree Owners that, in so holding, the district court erroneously imposed the "competitive injury" requirement applicable to a prima facie violation of § 2(a)[3] of the Robinson-Patman Act, 15 U.S.C. § 13(a).[4] See, e.g., FTC v. Simplicity Pattern Co., 360 U.S. 55, 65-67, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959); Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 584 (2d Cir.1987) (holding that competitive injury is an element of a § 2(a) claim). Section 2(a) prohibits price discrimination "where the effect of such discrimination may be substantially to lessen competition or ... to injure, destroy, or prevent competition with any person" involved in the discrimination. 15 U.S.C. § 13(a). We have identified three types of competitive injury that may result from such price discrimination:
 
 
 31
 A primary-line violation occurs where the discriminating seller's price discrimination adversely impacts competition with his — the seller's — competitors. In contrast, a secondary-line violation occurs where the discriminating seller's price discrimination injures competition among his customers, i.e., purchasers from him. Finally, ... a tertiary violation [may exist] ... where even though the purchasers of the discriminating seller did not compete directly, their customers competed within a unified market region.
 
 
 32
 Best Brands Beverage, 842 F.2d at 584 n. 1 (internal citations omitted). The district court's holding in this case that only competing vendors would have standing to sue on the basis of the challenged vendor payments effectively imposed a "primary line" competitive injury requirement on the Blue Tree Owners' § 2(c) claim.
 
 
 33
 As the Supreme Court explained in Simplicity Pattern, however,
 
 
 34
 [s]ubsections (c), (d), and (e) [of § 2 of the Robinson-Patman Act] unqualifiedly make unlawful certain business practices other than price discriminations .... [T]he proscriptions of these three subsections are absolute. Unlike § 2(a), none of them requires, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition.
 
 
 35
 360 U.S. at 65, 79 S.Ct. 1005 (holding that absence of competitive injury was not a defense to prima facie violation of § 2(e)); see also Biddle, 96 F.2d at 690 (noting that the competitive injury requirement of § 2(a) does not apply to § 2(c)); see also 14 Herbert Hovenkamp, Antitrust Law, ¶ 2362, at 233-34 & nn. 64-65, 235, 239 (1999) [hereinafter, "Hovenkamp"] (asserting that § 2(a)'s competitive injury requirement does not apply to § 2(c) claims).
 
 
 36
 While competitive injury is not an element of a prima facie violation of § 2(c), a private litigant seeking treble damages for such a violation under § 4 of the Clayton Act must nevertheless allege an antitrust injury. See In Town Hotels Ltd. P'ship v. Marriott Int'l, Inc., 246 F.Supp.2d 469, 475 (S.D.W.Va.2003); Abernathy v. Bausch & Lomb, Inc., 97 F.R.D. 470, 476 (N.D.Tex.1983); Hovenkamp, ¶ 2362, at 234-35; see also Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 335, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (rejecting argument that proof of a per se violation obviated requirement that private litigant prove antitrust injury). Antitrust injury and competitive injury are conceptually distinct. See generally Hovenkamp, Chap. 23D-1, ¶ 2371(b) (discussing distinctions at length); see also J. Truett Payne, 451 U.S. at 561-62, 101 S.Ct. 1923 (explaining some distinctions between § 2(a)'s competitive injury requirement and § 4's antitrust injury requirement); In Town Hotels Ltd. P'ship, 246 F.Supp.2d at 474-81 (S.D.W.Va.2003) (discussing distinction between types of injury in case involving similar facts). While competitive injury concerns the potential effect certain conduct may have on "competition generally" or "on the business opportunities of a defined class of competitors," Schwartz v. Sun Co., Inc. (R & M), 276 F.3d 900, 904 (6th Cir.2002), the focus of "antitrust injury" is on whether the challenged conduct has actually caused harm to the plaintiff, J. Truett Payne, 451 U.S. at 561-62, 101 S.Ct. 1923.
 
 
 37
 To establish antitrust injury, a private litigant must "prove... `injur[y] in its business or property' by reason of the violation ... [and that] the violation was at least a material cause of the plaintiff's injury." Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 710-11 (2d Cir.1983). In other words, a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); see Hovenkamp, ¶ 2362, at 234-35. With respect to the latter requirement, the Supreme Court has held that
 
 
 38
 [a] private plaintiff may not recover damages under § 4 of the Clayton Act merely by showing "injury causally linked to an illegal presence in the market." Instead, a plaintiff must prove the existence of "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."
 
 
 39
 Atlantic Richfield Co., 495 U.S. at 334, 110 S.Ct. 1884 (quoting Brunswick Corp. 429 U.S. at 489, 97 S.Ct. 690 (internal citations omitted)); see also J. Truett Payne, 451 U.S. at 562, 101 S.Ct. 1923. (holding that to have standing to bring a § 2(a) Robinson-Patman claim, a private plaintiff "must make some showing of actual injury attributable to something the antitrust laws were designed to prevent."). This requirement applies to all private actions filed under § 4, "regardless of the type of antitrust claim involved," Atlantic Richfield Co., 495 U.S. at 340, 110 S.Ct. 1884, or whether the challenged conduct constitutes a per se violation, id. at 341-42, 110 S.Ct. 1884.
 
 
 40
 In the instant case, the Blue Tree Owners assert that their complaint pleads the necessary antitrust injury based on their allegations that the Hotels compete with Starwood's hotels under the Westin and other brand names and that, as a result of the vendor payments, Starwood is a "dishonest competitor." They further allege that the vendor payments preclude the Blue Tree Owners from negotiating advantageous prices and terms with vendors who do not make such payments, and that they increase the cost of goods to the Blue Tree Owners while reducing the cost of the same goods for Starwood, resulting in an anti-competitive advantage for Starwood. We need not — and do not — decide whether these specific allegations would qualify as an antitrust injury as required by § 4 of the Clayton Act because, as we explain below, we conclude that plaintiffs have failed to state a claim for a substantive violation of § 2(c).
 
 IV. Robinson-Patman Violations
 
 41
 Courts and commentators are in agreement that § 2(c) was enacted primarily to target the practice of "dummy brokerages" whereby large retail buying groups — such as large grocery store chains, which, unlike smaller stores, did not need to use intermediary brokers to purchase their merchandise — would require suppliers to pay fees to "dummy brokers," who then passed the fees on to the large retailer, effectively reducing the price the retailer paid for the goods. See, e.g., Henry Broch & Co., 363 U.S. at 168-69, 80 S.Ct. 1158; Stephen Jay Photography, Ltd. v. Olan Mills, Inc., 903 F.2d 988, 992 (4th Cir.1990); Biddle, 96 F.2d at 690-92; Hovenkamp, ¶ 2362, at 217-18.
 
 
 42
 Some courts, applying § 2(c) to circumstances far removed from the paradigmatic "dummy brokerage" scheme, have held that § 2(c) also proscribes commercial bribery. See, e.g., Envtl. Tectonics, 847 F.2d at 1066; Grace, 538 F.2d at 173; Rangen, 351 F.2d at 858; Fitch v. Kentucky-Tennessee Light & Power, 136 F.2d 12 (6th Cir.1943). But see Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367, 372 (3d Cir.1985) ("There is good reason to question whether Congress intended to sweep commercial bribery within the ambit of section 2(c).").
 
 
 43
 The Second Circuit has never reached the question of whether — and under what circumstances — commercial bribery can form the basis of a claim under § 2(c). And we find that we need not decide the issue here. Even assuming that a § 2(c) claim could be based on commercial bribery, a necessary requirement for stating such a claim would be allegations sufficient to establish commercial bribery. See, e.g., Excel Handbag Co. v. Edison Bros. Stores, Inc., 630 F.2d 379, 387-88 (5th Cir.1980) (holding that a § 2(c) claim based on commercial bribery requires proof of commercial bribery). We conclude that the allegations in the Blue Tree Owners' complaint fail to meet this threshold requirement.
 
 
 44
 A. Plaintiffs' Allegations of Commercial Bribery
 
 
 45
 The Blue Tree Owners allege that Starwood and its vendors entered into purchase agreements pursuant to which the vendors would pay "allowances, bonuses, charges, commissions, credits, discounts, fees, incentives, profits, rebates, and/or kickbacks" to Starwood. Based on these allegations, the Blue Tree Owners contend that Starwood and its vendors engaged in a "Kickback Scheme" that constituted commercial bribery. This claim, however, is premised entirely on the tautology created by the fact that the Blue Tree Owners have labeled the payments made by vendors "Kickbacks": because the vendors pay kickbacks to Starwood, they are engaged in commercial bribery, and because the parties are engaged in commercial bribery, the payments made by vendors are kickbacks. Substituting the Blue Tree Owners' repeated use in their complaint of the freighted word "Kickback" with the more benign "vendor payment" reveals that the Blue Tree Owners have not alleged any improper intent or conduct on the part of the vendors who made the payments to Starwood.
 
 
 46
 To be sure, Starwood's failure to turn vendor payments over to the Blue Tree Owners may constitute a breach of its fiduciary duties under the Management Agreements, an issue as to which we express no view. But commercial bribery cannot be committed unilaterally by an alleged bribe receiver: one cannot be guilty of receiving a commercial bribe unless someone else is guilty of paying it. In New York, for instance, commercial bribery is defined as "confer[ring], or offer[ing] or agree[ing] to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs."[5] N.Y. Penal L. § 180.00. As New York Judge William Donnino has explained in his commentary to this statute, "[t]he essence of bribery, as defined in this article, is in the `intent' to influence improperly the conduct of another by bestowing a benefit, and the essence of bribe receiving is in the `agreement or understanding' that the recipient's conduct will be influenced by the benefit." William C. Donnino, Practice Commentary, appended to N.Y. Penal L. § 180.00 (McKinney's 1998).
 
 
 47
 In the absence of any allegations that the vendor payments were, in fact, bribes — that is, that they were paid by the vendors with the intent to improperly influence or corrupt Starwood's conduct on behalf of the Blue Tree Owners — Starwood's alleged breach of its fiduciary duties is insufficient to establish commercial bribery. No such allegations appear in the Blue Tree Owners' complaint, however.
 
 
 48
 Improper intent on the part of the vendors might be inferred from the Blue Tree Owners' allegation that vendors who were unwilling or unable to make the vendor payments were precluded from competing for the Hotels' business and, as a result, the Blue Tree Owners were unable to negotiate advantageous prices and terms with such vendors. But such an inference is belied by the letters attached to the Blue Tree Owners' complaint in which the Blue Tree Owners objected to the manner in which Starwood was allocating vendor payments. These letters contain no assertion that vendor payments are illegal or made pursuant to illicit agreements between Starwood and the vendors to act contrary to the Blue Tree Owners' interests. Rather, they demonstrate that as of December 1998, if not earlier, the Blue Tree Owners were aware that Starwood was receiving vendor payments as a result of its volume purchasing power.
 
 
 49
 Because the Blue Tree Owners' complaint does not allege that the vendor payments themselves were improper, the Blue Tree Owners have failed to allege facts constituting commercial bribery. Compare Excel Handbag Co., 630 F.2d at 386-87 (holding that evidence did not establish commercial bribery because there was no "proof of inducement"); United Magazine Co. v. Murdoch Magazines Distrib., Inc., 146 F.Supp.2d 385, 397 (S.D.N.Y.2001) (holding that allegation that discounts or payments passed from one business to another does not implicate bribery) with Envtl. Tectonics, 847 F.2d at 1054, 1066 (finding bribery based on payments to government official to induce award of government contract); Rangen, 351 F.2d at 854-55 (9th Cir.1965) (payments to state agent to maintain exclusive sales contract were bribes); Fitch, 136 F.2d at 13-14 (finding bribery based on payments to company's president to induce him to enter contract with vendor); Hansel `N Gretel Brand, 1997 WL 543088, at *1, *7 (finding commercial bribery scheme based on allegations that vendors overcharged principal and returned excess profits to principal's agent); Amata, 693 F.Supp. at 1380 (agent purchased only from vendors who agreed to pay bribes, and bribes were incorporated into principal's prices); Gregoris Motors, 630 F.Supp. at 905-06, 909 (payment of kickbacks to agent in order to induce him to accept falsified sales reports constituted bribery); Bunker Ramo Corp., 511 F.Supp. at 533 (finding bribery established where purchasing agent accepted payments in exchange for processing false invoices for goods never received by agent's principal).
 
 
 50
 B. Other Types of Robinson-Patman Violations
 
 
 51
 Of course, commercial bribery does not exhaust the factual scenarios that might state a claim based on a § 2(c) violation.[6] Nevertheless, we find that the Blue Tree Owners' failure to allege improper conduct by the vendors is equally fatal to any § 2(c) claim that might be brought on grounds other than commercial bribery.
 
 
 52
 As we have explained above, the Blue Tree Owners do not contend that the vendor payments themselves were improper. Indeed, the gravamen of their complaint is not that the vendors are making these payments, but that Starwood is retaining them in breach of its fiduciary obligations. The Blue Tree Owners concede as much in their reply brief on appeal, where they state:
 
 
 53
 The monies at issue are rebates to the Owners who are entitled to them but become kickbacks to the Managers [Starwood], when they retain that which belongs to their principals. In other words, the kickbacks are illegal in the hands of the Managers but are legal rebates in the hands of the Owners.
 
 
 54
 Appellants' Reply Br. at 25.
 
 
 55
 The sine qua non of a § 2(c) violation, however, is an improper payment, i.e., a payment of a commission, brokerage, or discount other than for services actually rendered. See Intimate Bookshop, Inc. v. Barnes & Noble, Inc., 88 F.Supp.2d 133, 140 (S.D.N.Y.2000) ("The fact that a direct payment or indirect discount passes from one party to another party does not compel the conclusion that the payment or discount violates Section 2(c).") (citing Henry Broch & Co., 363 U.S. at 175, 80 S.Ct. 1158). If, as plaintiffs concede, the vendor payments themselves did not violate § 2(c),[7] then they cannot be transformed into a § 2(c) violation simply because Starwood, an agent of the Blue Tree Owners, retained the payments.[8] See Fitch, 136 F.2d at 15. Indeed, for purposes of § 2(c), it is irrelevant whether an improper payment that is given to a purchaser's agent is kept by the agent for personal gain rather than transferred to the purchaser. See id. In light of the Blue Tree Owners' affirmative statement that the payments at issue here were proper,[9] their complaint fails to state a claim and, thus, was properly dismissed.
 
 CONCLUSION
 
 56
 For the foregoing reasons, we affirm the judgment of the district court dismissing the Blue Tree Owners' complaint.
 
 
 
 Notes:
 
 
 *
 The Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 Starwood Hotels & Resorts Worldwide, Inc. v. Aoki Corp., Index No. 602908-00 (Sup.Ct., N.Y. County 2000).
 
 
 [2]
 Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., Index No. 604295-00 (Sup.Ct., N.Y. County 2000).
 
 
 [3]
 Section 2(a) states in relevant part:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or the customers of either of them[.]
 15 U.S.C. § 13(a) (emphasis added).
 
 
 [4]
 Other courts have made similar errorsSee, e.g., Larry R. George Sales Co. v. Cool Attic Corp., 587 F.2d 266, 272 (5th Cir.1979) (limiting standing under § 2(c) to violator's competitors); Hansel `N Gretel Brand, Inc. v. Savitsky, No. 94 Civ. 4027(CSH), 1997 WL 543088, at *9 (S.D.N.Y. Sept.3, 1997) (importing competitive injury requirement of § 2(a) to § 2(c) claim); Bunker Ramo Corp. v. Cywan, 511 F.Supp. 531, 533 (N.D.Ill.1981) (requiring proof of competitive injury in § 2(c) claim).
 
 
 [5]
 Bribe receiving is similarly defined:
 An employee, agent or fiduciary is guilty of commercial bribe receiving in the second degree when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.
 N.Y. Penal L. 180.03.
 
 
 [6]
 Indeed, as we have observed, it remains an open question in this circuit whether commercial bribery can even form the basis of a § 2(c) claim
 
 
 [7]
 We express no view as to whether the facts contained in plaintiffs' complaint could support a substantive violation of § 2(c) in circumstances where a plaintiff alleges that the payments at issue are themselves improper
 
 
 [8]
 Indeed, it is unclear whether Starwood's status as an agent of the Blue Tree Owners is even relevant to the § 2(c) analysis. Section 2(c)'s proscription on payments to agents applies only to "an agent ... of any [other] party to [the] transaction." 15 U.S.C. § 13(c). The plaintiffs have not alleged that they are parties to the transactions that give rise to the vendor payments. In fact, in their complaint they concede that they have "no involvement in the negotiation and execution of [the] purchasing contracts." Compl. ¶ 25. If in fact Starwood, rather than the Blue Tree Owners, is the "other party to the transaction," then the Blue Tree Owners' § 2(c) claim is even more tenuous because they are neither parties to the transaction nor competing purchasers
 
 
 [9]
 We note that even if the Blue Tree Owners had not expressly conceded the propriety of the vendor payments, it is unlikely that this pleading deficiency could be cured by amending the complaint: Any assertion in an amended complaint that the vendor payments themselves were improper would negate the claim that the Blue Tree Owners, not Starwood, were the rightful recipients of the vendor payments. As we have stated, the proscriptions of § 2(c) apply regardless of whether the improper payment is made to the purchaser or its agentSee 15 U.S.C. § 13(c). "It shall be unlawful for any person... to pay ... anything of value ... either to the other party to such transaction or ([that party's] agent ....") (emphasis added); see Biddle, 96 F.2d at 691 ("Congress must have intended that payments by sellers should not be made to buyers through any one acting as agent for the buyer.... It may not be said that payments to buyers are in any different category than those to agents or those who act for or under the control of the buyers."); see also Fitch, 136 F.2d at 13. Thus, the illegality of the vendor payments would not be cured by simply handing them over to the Blue Tree Owners, who have not alleged that they render any services to the vendors. Rather, a transfer of the payments from Starwood to the Blue Tree Owners would simply result in the precise "evil" Congress sought to curb: the practice of vendors paying fees to a "dummy broker" — i.e., a buyer's agent — who, in turn, passes the fees over to the buyer. See Henry Broch & Co., 363 U.S. at 168-69, 80 S.Ct. 1158; Stephen Jay Photography, 903 F.2d at 992 (observing that § 2(c) was directed primarily to the practice whereby "a large buyer with economic clout might insist that in order to do business sellers must pay a fee to a designated `broker' ... [who] would then turn the money over to the large buyer").